788 A.2d 662

Antonio Donnell OESBY,

v.

STATE of Maryland.

Nos. 0445, 0447 and 0448, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Jan. 4, 2002.

Bradford C. Peabody, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Shannon E. Avery, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, Baltimore, and Jack Johnson, State's Attorney for Prince George's County, Upper Marlboro, on the brief), for appellee.

Submitted before MURPHY, C.J., and CHARLES E. MOYLAN, Jr. (Retired, specially assigned) RAYMOND G. THIEME, Jr. (Retired, specially assigned), JJ.

CHARLES E. MOYLAN, Jr., Judge, Retired, Specially Assigned.

During the month of February 2001, the appellant, Antonio Donnell Oesby, was convicted in three separate trials by three separate Prince George's County juries, all presided over by Judge E. Allen Shepherd, of a variety of assaults on women.

On February 1, 2001, he was convicted of 1) a third degree sexual offense, 2) second degree assault, and 3) carrying a deadly weapon openly with intent to injure (No. 0445). The victim of those crimes, committed on November 3, 1999, was Teresa Hicks. On February 5, he was convicted of 1) attempted armed robbery, 2) second degree assault, and 3) carrying a deadly weapon openly with intent to injure (No. 0447). The victim of those crimes, committed on November 4, 1999, was Madinah Rasheed. On February 14, he was convicted of 1) a third degree sexual offense, 2) armed robbery, and 3) carrying a deadly weapon openly with intent to injure (No. 0448). The victim of those crimes, committed on October 27, 1999, was Martha Yates.

Two of the appellant's four contentions challenge pretrial rulings made at a single pretrial hearing that applied to all three trials. The appellant complains:

1. that Judge Shepherd erroneously failed to suppress physical evidence seized pursuant to an allegedly defective search warrant; and

2. that Judge Shepherd, in ruling on a motion in limine, erroneously agreed to admit "other crimes evidence" at each of the three trials.

The third contention concerns a proposed jury instruction that was requested and denied in two of the three cases. The appellant complains:

3. that Judge Shepherd erroneously failed to give his requested instruction concerning the specific intent element of the crime of carrying a weapon openly with intent to injure; with respect to the third trial, the appellant claims, pursuant to the notion of "plain error," that Judge Shepherd

erroneously failed to give the instruction spontaneously even though he was never requested to do so.

The fourth and final contention arose out of the sentencing hearing that was common to all three trials. In that regard, the appellant complains:

4. that Judge Shepherd erroneously failed to merge lesser included second degree assault convictions into other convictions for greater inclusive offenses.

Because of the commonality of the issues, it is meet that we consolidate these three appeals into a single appeal.

### The Search Warrant

The first contention concerns the pretrial denial of the appellant's suppression motion. Pursuant to a search warrant issued by District of Columbia Superior Court Judge Peter Wolf to Detective Karen Moss, D.C. police searched the appellant's residence at 625 L Street, Northeast, in the District. Recovered in that search and later received in evidence were 1) a black knit hat and 2) a black leather jacket, both identified by both victims as having been worn by the assailant in the assaults committed on Hicks and Rasheed.

The appellant does not challenge the probable cause to believe that he was the assailant. Indeed, all three victims (plus a fourth not directly involved with this appeal) had selected a photograph of him from photographic arrays. The basis of the appellant's challenge was that the warrant application failed to establish an adequate nexus between the appellant and 625 L Street, Northeast. The application and its supporting affidavit sought a warrant:

FOR THE PREMISES OF 625 "L" STREET, NORTH-EAST, WASHINGTON, D.C. THE PREMISES IS A THREE STORY, PINK AND WHITE BRICK ROW-HOUSE....

On October 31, 1999, an adult complainant reported to the member of the Prince George's County Police Department that she had been the victim of a sexual assault.

The complainant explained that she was approached by the defendant while unloading groceries from her vehicle.... The defendant displayed a knife.... [After committing forced sexual acts on the complainant], the defendant took one hundred and forty dollars in U.S. Currency and a business card with the complainant's name printed on it.

Members of the Prince George's County Police Department became aware of an arrest made by the affiant with similar circumstances. A photograph of the defendant was obtained from the affiant and utilized in a photo array by members of the Prince George's County Police Department. The defendant was positively identified as the person who sexually assaulted her.

All other identifiable information of the defendant was submitted to Prince George's County Police Department from the affiant.

*Based on the aforementioned facts, the affiant has probable cause to believe that* ANTONIO DONNELL OESBY, did commit the Sexual Assault which occurred in Prince George's County Maryland and that *evidence of this crime may be located inside of 625 "L" Street, Northeast, Washington, D.C.* Specifically, a business card, clothing worn and the weapon used during the offense. It is therefore respectfully requested that a District of Columbia Superior Court Judge issue a Search Warrant, directing a search of the premises described herein, authorizing the seizure of any evidence connected to the case.

(Emphasis supplied).

### A. Inadequacy of the Nexus

■ We agree with the appellant that the application for the search warrant failed to establish an adequate nexus between the person of the appellant and the Washington, D.C. residence that was searched. Dispositive on this issue is Judge Hollander's definitive opinion for this Court in *Braxton v. State*, 123 Md.App. 599, 618–31, 720 A.2d 27 (1998). The issue there was indistinguishable from the issue here:

*Appellant posits that the warrant* was not based on probable cause because the supporting affidavit *failed to specify that the targeted apartment actually was appellant's residence.* Even if the affidavit implied that the subject premises was appellant's place of abode, Braxton contends that the affidavit was defective because it lacked any factual foundation to substantiate that assertion. Specifically, *Braxton complains that the affidavit was devoid of facts particularizing the basis for the affiant's belief that the targeted premises was actually appellant's residence.*

123 Md.App. at 618–19, 720 A.2d 27 (emphasis supplied).

The warrant application in that case actually represented more of a predicate than we have here for an inference of the required connection, as it at least linked the name of the suspect with the street address of the place to be searched:

Persons/Premises to be Searched:

*Arnold Braxton, Jr.* M/B/10–31–75 BPI# 440–492, *4310 Seminole Ave. Apt.* A three story brick apartment building with the numbers 4310 affixed. Apt. 203 has a white door the numbers 203 on the same.

123 Md.App. at 611, 720 A.2d 27 (emphasis supplied). In our case, there is no such juxtaposition of the person and the place.

By way of a further footing for the required inference in *Braxton,* the warrant application in that case went on to aver that criminals frequently store the fruits of their crimes in their residences:

*It is common for persons who have committed armed robberies to store the fruits of their crimes in the place of their residence* as well as the weapons used to commit these offenses. *It is for this reason that Your Affiant prays that a search and seizure warrant be issued for the above named persons and premises.*

123 Md.App. at 613, 720 A.2d 27 (emphasis supplied).

We rejected even that significantly stronger predicate for the required inference as still inadequate. Judge Hollander explained, 123 Md.App. at 629–30, 720 A.2d 27:

In construing the affidavit here, the issuing judge first had to infer that the targeted premises was appellant's residence, based on the street address on the face of the affidavit, coupled with the general assertion that criminals typically store fruits and instrumentalities of crime in their residences. Yet the affidavit contained absolutely no clue as to *why* the police believed appellant lived at the particular location identified in the affidavit and warrant application; *the affidavit failed to provide a factual basis for the claim that the targeted premises was the suspect's residence.* Thus, it did not guard against an unfounded intrusion into one's sanctuary. As the State candidly conceded at oral argument, we may not uphold a warrant merely because the premises turned out to be the suspect's home. In other words, the ends cannot justify the means.

(Emphasis supplied).

Our holding in *Braxton* was unmistakably clear:

Accordingly, we hold that *the mere identification in the affidavit of appellant's address, without even a single predicate fact showing the basis for the belief that appellant resided at that address, did not establish probable cause to search that location.* This is so even if there was otherwise every reason to believe that appellant committed the armed robbery and harbored the fruits and instrumentalities wherever he may have lived.

123 Md.App. at 630, 720 A.2d 27 (emphasis supplied). See also *United States v. Hove,* 848 F.2d 137 (9th Cir.1988).

The requirement placed on the police in this regard is not onerous, but it is something that cannot be ignored. Again, Judge Hollander explained:

Given the urgency that is often associated with matters such as this one, we acknowledge that a police officer cannot always prepare the kind of detailed statement that would serve as a textbook example of a model affidavit. But *the quantum of facts needed to show the connection between the suspect and the purported place of occupancy is hardly daunting.* Typically, an affidavit includes an averment

tying the suspect to the targeted location on the basis of surveillance, a check of utility records, verification with a landlord, an address from the phone book, or the like.

123 Md.App. at 630, 720 A.2d 27 (emphasis supplied).

## B. The "Good Faith" Exception

■ On the ultimate issue of suppression, however, the appellant wins the battle but loses the war. In foretelling this contrapuntal swing of the pendulum, *Braxton v. State* is again the soothsayer. Although the drawing of the inference in this case, as we have been discussing, may not have been legally sustainable, the failure to spell out a more detailed nexus was by no means so egregious a flaw that the officers could be held to have acted in "bad faith" in submitting the warrant application and in relying on the warrant. As one of the detectives testified at the suppression hearing, the police believed that the appellant was living with his aunt, Kim Powell, at the Washington address recited in the warrant application.

The police inadvertently neglected to set forth some easily ascertainable facts and then to connect the dots. It was a fault, but hardly a grievous one. Although more than a hypertechnicality, to be sure, the establishment of the nexus is understandably a peripheral aspect of the police focus as attention concentrates on the core issue of underlying criminality. The officers were fully entitled to the "good faith" exception to the Exclusionary Rule established by *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) and *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

■ At the outset, our entitlement to consider the applicability of the "good faith" exception for the first time on appeal, notwithstanding that the issue was not addressed by Judge Shepherd, is not to be doubted. *McDonald v. State*, 347 Md. 452, 470 n. 10, 701 A.2d 675 (1997); *Connelly v. State*, 322 Md. 719, 735, 589 A.2d 958 (1991) ("As the application of the good faith exception to the allegations of the affidavit presents an objectively ascertainable question, it is for the appellate court

to decide whether the affidavit was sufficient to support the requisite belief that the warrant was valid."); *Braxton v. State,* 123 Md.App. at 631–32, 720 A.2d 27.

In applying the "good faith" exception to a gap in the required nexus between the person of the defendant and the place of his residence, one of the cases relied on by us in *Braxton* was *State v. Varnado,* 675 So.2d 268 (La.1996). That case is indistinguishable from the one now before us. Judge Hollander, 123 Md.App. at 641, 720 A.2d 27, characterized, with approval, its holding:

> The *Varnado* court recognized that the police had probable cause to search the defendant's residence. But, sounding a now familiar chord, the court found "a critical omission in *the warrant application,*" because it *failed "to identify the targeted premises as the defendant's residence." Id.* at 270. Nonetheless, because the exclusionary rule is intended to deter police misconduct, not to punish the mistakes of judges, the court concluded that, "under the particular circumstances of this case, application of the exclusionary rule would serve no remedial purpose." *Id. The court reasoned that "[t]he officer had no apparent purpose for omitting the information linking the defendant to the residence* .... " *Id.* at 271. *Indeed, the court believed that another officer in the same position "would not have noticed the defect* .... " *Id.*

(Emphasis supplied) See also *United States v. Procopio,* 88 F.3d 21 (1st Cir.1996); *United States v. Brown,* 832 F.2d 991 (7th Cir.1987).

Our closing observation in *Braxton,* 123 Md.App. at 643, 720 A.2d 27, is pertinent here:

> In our good faith analysis, we also consider it significant that *the affidavit set forth ample probable cause linking appellant to the armed robbery.* Further, *by inference, the affidavit identified the targeted address as appellant's residence* and, as appellant concedes, *there was probable cause to search appellant's residence, wherever it may have been. The gap essentially concerned an intermediate premise;*

the affidavit failed to include any fact supporting the affiant's assertion that appellant resided at the targeted address. Yet we cannot overlook that appellant's arrest record provided the detective with a valid basis to believe that appellant resided at the premises in question. Thus, *the officer's error was one of omission; there was no suggestion that the detective purposefully failed to disclose the information or otherwise acted in bad faith.*

(Emphasis supplied).

We affirm the ruling of Judge Shepherd that the physical evidence should not have been suppressed.

### The "Other Crimes" Evidence

Within a nine-day period, four lone women, living in close proximity to each other in Prince George's County, were approached in the common areas of their garden style apartment complexes in an ostensibly friendly and unthreatening manner and, when their guards were then relaxed, were attacked. The crimes against three of the women are the subject of this consolidated appeal. The crimes against the fourth woman also constitutes part of the "other crimes" evidence. The multitudinous similarities in the crimes were carefully detailed by Judge Shepherd. We cannot improve on his careful compilation and analysis of the ultimately overflowing accumulation of common features.

"We heard the testimony of four witnesses, Martha Yates, who was assaulted on October 27th, 1999; Amy Hixenbaugh, who was assaulted and raped on October 31st, 1999; Teresa Hicks, who was assaulted on November 3rd, 1999; and Madinah Rasheed, who was assaulted on November 4th, 1999.

The question before the court is whether to allow other crimes evidence in three of these assaults in the trial of the defendant for the remaining assault. *In three of four situations, the assailant would begin talking to each woman as she entered or approached the common area of her garden style apartment house.*

He would pretend to need assistance of some sort or need direction of some sort, and would engage each woman in nonthreatening conversation as she moved toward her apartment. In the fourth situation, which was Yates, the victim did not feel threatened and turned her back on the assailant who attacked her immediately.

*In three instances, Hicks, Yates, and Rasheed, the woman would turn her back to the assailant believing that there was no danger, and the assailant would immediately assault the woman by clasping his right hand over her mouth and holding a knife to her neck.*

With Hixenbaugh, the last victim, she made several trips from her car to the front of her apartment carrying groceries. Finally thinking that the assailant posed no threat to her, she turned her back and opened her door, carried some groceries into her apartment and retrieved some tissue that the assailant had requested of her.

When she turned to go out to the common area to give the tissue to the assailant and to get the remaining groceries she came face to face with her assailant, who at that point was armed with a knife and was now inside her apartment.

He thereupon ordered her upon threat of death into her bedroom where he forced her to perform fellatio and raped her two times. Before he left he told her that he would kill her if she reported it.

*All three other victims, Yates, Hicks, and Rasheed, gave similar descriptions of their assailants. All three positively identified Oesby as the assailant from the photo spread [from which] Hixenbaugh had identified Oesby.*

*Hicks, Yates, and Rasheed gave similar descriptions of the clothing worn by the assailant. All four described the weapon used as a knife, a silver blade and a brown handle, approximately eight to ten inches long totally.*

With Hicks and Hixenbaugh there was no resistance by the victim and the assailant told each of them if they told anyone he would come back and kill them. *The modus*

*operandi was the same in each case, the engaging in conversation on a pretext of one thing or another in a manner to take each woman off her guard, and then to strike at the moment that each of the intended victims was, in fact, off guard.*

*All four of these crimes occurred within nine days of each other. All four of these crimes occurred within or near a common area of garden style apartments, and all four of these crimes were pursued for sexual reasons, even though with Rasheed, the last victim, she began resisting before the assailant got to the point of taking her clothes off.* Robbery was a secondary motive of each of these crimes.

Citing from Moore versus State, 73 Maryland Appeals 36 at 41[, 533 A.2d 1], "Thus, it may be said that the inference of identity arises when the marks common to the offense, considered singly or in combination, logically operate to set the offenses apart from other crimes of a same general variety, and in so doing tend to suggest that the perpetrator of the crimes [is] the perpetrator of the offense [as] charged," meaning the one that's being tried.

"The court is persuaded that due to the unique circumstances of this case, the evidence of other crimes has special or heightened relevance, and due to the special or heightened relevance of the evidence, it is more probative than unfairly prejudicial to the defendant, and the defendant's involvement in the other crimes evidence has been established by clear and convincing evidence, and beyond that, the identification of a person as the person who committed the crime if believed beyond a reasonable doubt is enough for a conviction," so it's more than clear and convincing.

Accordingly, the court will permit the introduction of other crimes evidence in the state's case in chief on the issue of identification. I would note that with reference to Rasheed the time was 8:30 p.m. With Hicks the time was 12:40 p.m. With Yates it was in the evening, 9:00 to 9:30 p.m., with Hixenbaugh 7:00 p.m.

*Each area in each of those cases was a garden style apartment,* the approach to the apartment and the common

area. With regard to Rasheed, there were at least six separate questions that were asked by the assailant beginning with, "Do you know Tyrone King."

With regard to Hicks, there were at least five questions asked of Hicks beginning with, "Do you have a key to the laundry room," and ending, I think, with, "Can I use your cell phone."

[With] Yates, there was no conversation because as indicated earlier she saw the assailant and then turned her back on him without any conversation. At that moment he did the same thing as he did with the other victims. He used that as an opportunity to attack.

Hixenbaugh, three questions, plus an offer to help with bags, attempts to be charming and helpful, and a request, the request that took her off the guard, the asking for tissue, whereupon she turned and put herself in the position of extreme peril.

*In each and every instance, the attack was accomplished by the getting the victim to turn [her] back on the assailant. In the Rasheed, Hicks, and Yates cases there were descriptions of clothing and hats that were very similar to one another.*

*In the Rasheed, Hicks, and Yates cases, there was a description of the assailant as being clean shaven.* A knife, as I mentioned earlier, were all similarly described. There were no parting words to Rasheed because as she wrestled him to the ground, the knife came loose and he ran away.

There were none with Yates because he ran off taking her pocketbook when he believed that someone was coming. With Hicks and Hixenbaugh he told each of those persons, "If you tell anyone about this, I will come back and kill you." So the court will permit the other crimes evidence.

(Emphasis supplied).

## A. Stage One of the Analysis: The "Right or Wrong" Standard of Appellate Review

Before evidence of "other crimes" may be admitted against a defendant, a three-step analysis must be undertaken

by the trial judge. The first determination is an exclusively legal one, with respect to which the trial judge will be found to have been either right or wrong. In *State v. Faulkner,* 314 Md. 630, 634–35, 552 A.2d 896 (1989), Judge Adkins described that first step:

When a trial court is faced with the need to decide whether to admit evidence of another crime—that is, evidence that relates to an offense separate from that for which the defendant is presently on trial—it first determines whether the evidence fits within one or more of the *Ross* [*v. State,* 276 Md. 664, 350 A.2d 680 (1976) ] exceptions. *This is a legal determination and does not involve any exercise of discretion.*

(Emphasis supplied).

In *Moore v. State,* 73 Md.App. 36, 44–45, 533 A.2d 1 (1987), Judge Wilner further explained this first step of the analysis:

*For the evidence even to qualify for admission, it must fall within one of the exceptions that the court has recognized or would be willing to recognize as having an independent relevance* and, although, because this is largely a factual question, it will ultimately depend on how the last appellate court to review the case happens to view the matter, *it is not a discretionary ruling. The element of discretion arises only when the evidence does fall within a permissible exception and is thus prima facie admissible.* It is then that the court must balance the independent relevance against the danger of undue prejudice and decide whether to exclude the evidence notwithstanding its facial admissibility. *That* is the discretionary decision—to *ex* clude otherwise admissible evidence, not to *in* clude otherwise inadmissible evidence.

(Emphasis supplied).

## B. The Expanding List of Exceptions

Before we embark on that analysis of whether the evidence of "other crimes" fits within one of the exceptions, it will help to have handy a list of accepted categories of exceptions. In

1976, *Ross v. State,* 276 Md. at 669–70, 350 A.2d 680, listed the classic five exceptions that this Court later described in *Solomon v. State,* 101 Md.App. 331, 353–54, 646 A.2d 1064 (1994):

On any list of the representative or illustrative types of issues that have regularly been found to possess substantial relevance, the first rank invariably consists of the quintet brought to the front of the mind by the mnemonic aid MIMIC:

1. MOTIVE
2. INTENT
3. Absence of MISTAKE or accident
4. IDENTITY
5. COMMON scheme or plan

*Harris v. State,* 324 Md. at 501, 597 A.2d 956; *State v. Faulkner,* 314 Md. at 634, 552 A.2d 896; *Ross v. State,* 276 Md. at 669–70, 350 A.2d 680.

Since 1976, however, that list has been regularly expanded. The ever-growing nature of the list of illustrative examples or "exceptions" fulfills the prediction we made in *Anaweck v. State,* 63 Md.App. 239, 257, 492 A.2d 658, *cert. denied,* 304 Md. 296, 498 A.2d 1183 (1985):

These five examples of relevance given by *Ross* and repeated by all of its progeny do not exhaust the category; *it is an open-ended list always capable of expansion wherever a clear instance of relevance might arise that somehow fails to fit neatly into one of the pigeonholes* (emphasis supplied).

*State v. Edison,* 318 Md. 541, 547, 569 A.2d 657 (1990), recognized the same open-ended nature of the evidentiary category:

[E]xceptions to the general rule are not limited to those noted in *Ross; the Ross exceptions are not exclusive.* (emphasis supplied).

In *Harris v. State,* 324 Md. 490, 501, 597 A.2d 956 (1991), Judge McAuliffe emphatically reaffirmed this same essential characteristic:

We reinforce a point we have previously made—that *the recognized "exceptions": to the exclusionary rule are not exclusive.... This is a representative list* of examples in which evidence has been found to meet the exception to the general rule of exclusion; *it is not a laundry list of finite exceptions.* (footnote omitted, emphasis supplied).

In *Solomon v. State,* 101 Md.App. at 354–55, 646 A.2d 1064, this Court catalogued some of the more recent additions to the list of exceptions:

Those five, however, are by no means the only entries one finds even on the most ordinary of listings. Without benefit of mnemonic device, some of the other "regulars" are:

6. When several offenses are so connected in point of time or circumstances that one cannot be fully shown without proving the other. *Ross v. State,* 276 Md. at 670, 350 A.2d 680; *Tichnell v. State,* 287 Md. 695, 712, 415 A.2d 830 (1980).

7. Where the "other crime" tends to show a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial. *Berger v. State,* 179 Md. 410, 414, 20 A.2d 146 (1941); *Ross v. State,* 276 Md. at 670, 350 A.2d 680; *Vogel v. State,* 315 Md. 458, 465, 554 A.2d 1231 (1989); *Acuna v. State,* 332 Md. 65, 72–76, 629 A.2d 1233 (1993).

8. "[P]rior criminal conduct ... may be admitted ... to show consciousness of guilt." *State v. Edison,* 318 Md. 541, 547, 569 A.2d 657 (1990).

9. "[O]ther like crimes by the accused so nearly identical in method as to earmark them as the handiwork of the accused." *Ross,* 276 Md. at 670, 350 A.2d 680. Whereas *Ross* treats this use of a peculiar *modus operandi* or "signature" as an exception in its own right, *State v. Faulkner,* 314 Md. at 638–640, 552 A.2d 896, treats it merely as a variety or aspect of the "identity" exception. This minor difference of opinion in conceptualization makes the larger point—that it is relevant evidence on a

material issue in any event, regardless of how one categorizes or conceptualizes it.

With the passing years, the list of representative examples continues to grow. Taking their cue from Federal Rule of Evidence 404(b), the recent cases now routinely list as recognized exceptions:

10. Opportunity
11. Preparation
12. Plan
13. Knowledge

*State v. Faulkner*, 314 Md. at 634, 552 A.2d 896; *State v. Edison*, 318 Md. at 547, 569 A.2d 657; *Harris v. State*, 324 Md. at 501 n. 3, 597 A.2d 956.

■ As the number of recognized categories of exceptions expands, there is, as a matter of course, inevitable overlapping. Some ostensibly new exceptions are self-evidently nothing but more tightly focused or more highly particularized instances of some other more generic exception. The label we put on an exception, therefore, is not that important, just so long as the evidence of "other crimes" possesses a special or heightened relevance and has the inculpatory potential to prove something other than that the defendant was a "bad man."

## C. The Special or Heightened Relevance in This Case

■ In this case, we hold that at each of the respective trials involving the crimes against Madinah Rasheed and Martha Yates,[1] the evidence of the other three sets of crimes

---

1. We decline to examine the "other crimes" evidence in the trial of the crimes against Teresa Hicks (No. 0445). After the appellant's motion *in limine* was denied, he neglected, inexplicably, to renew his objection to the "other crimes" evidence at the trial of that particular case. Such a renewal is required in order to preserve the issue for appellate review. *Reed v. State*, 353 Md. 628, 638, 728 A.2d 195 (1999); *Prout v. State*, 311 Md. 348, 356–57, 535 A.2d 445 (1988); *Marshall v. State*, 85 Md.App. 320, 328–29, 583 A.2d 1109 (1991).

Although it is inconceivable that our resolution of this issue would not have been the same as were our resolutions of the indistinguishable

was properly admitted. In terms of the classic or more generic categories of exceptions, the special relevance of the "other crimes" evidence could take its label from the fact that it helped to establish the "identity" of the appellant as the assailant. As an academic or philosophic matter, however, it might as readily be maintained that the evidence tended to establish the "absence of mistake" when the direct victim of the crimes on trial identified the appellant as her assailant. In the circumstances of this case, that second categorization is simply a corollary of the first.

One could also, moreover, categorize the evidence as establishing a "signature" *modus operandi.* That, of course, is just one particular way of proving "identity." The label does not really matter when the labels are frequently but different ways of saying the same thing. "A rose by any other name...." What matters is that the evidence of the "other crimes," however it might be categorized or labeled, enjoyed a special or heightened relevance in helping to establish the identity of the appellant as the perpetrator of the crimes on trial.

Judge Wilner's analysis in *Moore v. State,* 73 Md.App. at 47–48, 533 A.2d 1, in affirming the admissibility of "other crimes" evidence as fitting within the "signature" subdivision of the "identity" exception, is equally pertinent as we place our imprimatur on the evidence in this case as evidence enjoying a special or heightened relevance.

We conclude that sufficient similarities, and sufficient distinctiveness, were shown to warrant admission of the evidence under the exception as generally stated in McCormick, § 190(3). *Although some of the common "marks" proffered by the State are themselves unremarkable and therefore entitled to little or no weight, others, in combination do tend to show a modus operandi that is distinctive. The method of encounter*—showing a similar family picture, *politely asking directions, engaging the victim in innocent,*

issues in the two companion cases, we steadfastly refuse to compromise the preservation requirement.

*nonthreatening conversation—is itself a distinctive "mark" under the cases.* · The immediate choking, ultimately to the point of unconsciousness, *the particular attack upon the face and neck, the fact that all three attacks occurred* mid-day *when a housewife might be home alone—each, and all together, tend to make even more specific the modus operandi.*

(Emphasis supplied).

## D. Stage Two of the Analysis: The "Clearly Erroneous" Standard of Appellate Review

■ The second stage of the analysis that must be undertaken, as well as the appropriate standard of appellate review for such second-stage decisions, was well described by *Solomon v. State,* 101 Md.App. at 338–39, 646 A.2d 1064:

The second procedural step calls for preliminary fact finding by the trial judge. The allusion to some other crime allegedly committed by the defendant may be no more than a bald and unsubstantiated assertion by the witness. The alleged crime may never have led to an arrest, let alone a conviction. Indeed, it may never have been investigated or even discovered. *It is for that reason that the trial judge needs to be persuaded,* by the clear and convincing standard, *that the alleged crime did, indeed, take place before he allows evidence of it to come into evidence.* Judge Adkins explained:

If one or more of the exceptions applies, the next step is to decide whether the accused's involvement in the other crimes is established by clear and convincing evidence. We will review this decision to determine whether the evidence was sufficient to support the trial judge's finding. (citations omitted).

314 Md. at 635, 552 A.2d 896. *Because the weight to be given the preliminary evidence as to the existence of the other crime is of necessity for the trial judge in his ancillary fact-finding capacity, the reviewing court, under the clearly erroneous standard, is limited to determining the existence of a prima facie case in that regard.*

(Emphasis supplied). At that stage of the analysis, it is the trial judge who must be persuaded, not the appellate court. The only appellate concern is whether there was some basis from which a rational fact-finding trial judge could have concluded that the "other crimes," in fact, took place.

█ In this case, Judge Shepherd made the appropriate finding:

"The court is persuaded that the defendant's involvement in the other crimes evidence has been established by clear and convincing evidence."

That finding by Judge Shepherd was unassailable. *A fortiori*, it was not clearly erroneous.

### E. Stage Three of the Analysis: The "Abuse of Discretion" Standard of Appellate Review

█ The third stage of the analysis requires a balancing by the trial judge between the probative value of the "other crimes" evidence and its possibly unfair prejudicial effect. *Solomon v. State* described this analytic stage:

The third step for the trial judge is discretionary. Even when the first two hurdles have been cleared, the judge must still weigh the necessity for and probative value of "other crimes" evidence against any undue prejudice that it may cause the defendant:

If this requirement is met, the trial court proceeds to the final step. The necessity for and probative value of the "other crimes" evidence is to be carefully weighed against any undue prejudice likely to result from its admission. This segment of the analysis implicates the exercise of the trial court's discretion. (citations omitted).

101 Md.App. at 339, 646 A.2d 1064.

### F. What Do We Weigh? All Prejudice Or Only Unfair Prejudice?

The ill effect that militates against admissibility is not prejudice generally, but only *unfair* prejudice. In a larger sense, all competent and trustworthy evidence offered against

a defendant is prejudicial. If it were not, there would be no purpose in offering it. The special relevance that gives "other crimes" evidence its probative value *ipso facto* makes it prejudicial in that it is, by definition, strong but legitimate proof that the defendant is guilty.

Such self-evident prejudice in the larger sense, however, is not the "unfair" prejudice that should enter into the balancing process. To measure probative value against legitimate prejudice would be to measure probative value against itself. In such an exercise in futility, the scales could never tilt in favor of probative value. That obviously is not what the balancing test is designed to do. The "unfair" component of the prejudice is not the tendency of the evidence to prove the identity of the defendant as the perpetrator of the crimes. What is "unfair" is only the incremental tendency of the evidence to prove that the defendant was a "bad man." As we balance, therefore, the emphasis must be not on the noun "prejudice" but on the qualifying, and limiting, adjective "unfair."

It is the failure to appreciate this distinction that leads many analyses astray. There is frequently a tendency to conclude that if the State's case is otherwise a strong one, the probative value of "other crimes" evidence is proportionately diminished. That is not the case. Probative value does not depend on necessity. When we are talking only about the legitimate prejudice that inevitably results from competent evidence enjoying a special or heightened relevance, there is no downside to making a strong case even stronger.

The probative value must, of course, be measured against the "unfair" component of the prejudicial evidence. When that is the subject of the balancing, necessity is a factor. We balance 1) the need for the evidence against 2) the tendency of the evidence to prejudice the defendant unfairly. In terms of legitimate prejudice, on the other hand, the State is not constrained to forego relevant evidence and to risk going to the fact finder with a watered down version of its case. Were it not for the incremental ill effect, "other crimes" evidence of identity would be no more challengeable than a fingerprint or

an identification by the victim. There is nothing inherently suspect about it as a modality of proof. We are wary only about its peripheral effect, not about its core function.

 The first two stages of the "other crimes" analysis having been satisfied, Judge Shepherd engaged in the final balancing procedure in this case::

"The court is persuaded that due to the unique circumstances of this case, the evidence of other crimes has special or heightened relevance, and due to the special or heightened relevance of the evidence, *it is more probative than unfairly prejudicial* to the defendant. . . ."

(Emphasis supplied).

Astutely, Judge Shepherd did not rule that the evidence was "more probative than prejudicial." That, as we have explained, would be mathematically impossible, because probative value is directly proportionate to legitimate prejudice and could never, therefore outweigh it. The two are flip sides of the same coin. Inculpatory evidence is, by definition, prejudicial to the defendant's case, but prejudice in that sense gives us no pause. Judge Shepherd ruled, rather, that the evidence was "more probative than *unfairly* prejudicial." (Emphasis supplied). That, and that alone, is the thing that should have been measured.

 This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge. The appellate standard of review, therefore, is the highly deferential abuse-of-discretion standard. The fact that we might have struck the balance otherwise is beside the point. We know of no case where a trial judge was ever held to have abused his discretion in this final weighing process. As a practical matter, that will almost never be held to have occurred. A properly disciplined appellate court will not reverse an exercise of discretion because it thinks the trial judge's decision was wrong. That would be substituting its judgment for that of the trial court, which is inappropriate if not forbidden. Reversal should be reserved for those rare and bizarre exercises of discretion that are, in

the judgment of the appellate court, not only wrong but flagrantly and outrageously so. In this case, we see no faint or distant glimmer of even arguable abuse.

## G. The Admissibility of the "Other Crimes" Evidence

We hold that Judge Shepherd 1) was not legally incorrect in determining that the "other crimes" evidence in this case had special or heightened relevance; 2) was not clearly erroneous in being persuaded that the other crimes had, in fact, occurred; and 3) did not abuse his discretion in ruling that the probative value of the evidence outweighed the unfair prejudice that might result from it. We affirm his decision to admit the evidence.

### Jury Instruction:

### " ... With the Intent or Purpose of Injuring"

In each of the three cases against him, the appellant was convicted, *inter alia,* of having violated Art. 27, Sect. 36(a), which provides in pertinent part:

Every person who shall ... carry any ... knife ... openly *with the intent or purpose of injuring any person* in any unlawful manner shall be guilty of a misdemeanor....

(Emphasis supplied).

In two of his trials, those involving the offenses committed against Madinah Rasheed and Martha Yates, the appellant expressly requested a jury instruction on the mental element of specific intent. The pertinent part of that requested instruction was:

*The offense* of openly carrying a dangerous and deadly weapon with the intent to injure *requires proof of the specific intent to cause injury.* If the State fails to prove beyond a reasonable doubt that the Defendant had *the specific intent to injure* [the victim] you must find him not guilty of this charge.

(Emphasis supplied).

In effect, Judge Shepherd instructed the jury in just such a fashion. His instruction tracked, essentially verbatim, Mary-

land Pattern Jury Instruction–Criminal (MPJI–Cr) 4:35, which in pertinent part provides:

> The defendant is charged with the crime of carrying a dangerous weapon openly *with the intent to injure another person.* In order to convict the defendant, the State must prove:
>
> (1) that the defendant wore or carried a dangerous weapon; and
>
> (2) that it was carried openly *with the intent to injure another person.*

(Emphasis supplied). Omitting only the words "the crime of," Judge Shepherd advised the jury:

> [T]he Defendant is charged with carrying a dangerous weapon openly *with the intent to injure.* In order to convict the Defendant, the State must prove, first, that the Defendant wore or carried a dangerous weapon, and second, that it was carried openly *with the intent to injure another person.*

(Emphasis supplied).

We agree with the appellant that the crime that was the subject of this instruction is a specific intent crime. *Hoes v. State,* 35 Md.App. 61, 73, 368 A.2d 1080 (1977); *Wieland v. State,* 101 Md.App. 1, 30–31, 643 A.2d 446 (1994). The jury in this case was so instructed. The only specific intent of any pertinence to this case was fully and precisely explained to the jury. The appellant's chagrin, however, appears to be that the term of art "specific intent" was never expressly employed.

There are, to be sure, a large number of crimes requiring, as an additional mental element beyond the minimal *mens rea,* a specific intent or purpose to achieve some more remote objective beyond the mere doing of the immediate criminal act. There are dozens and dozens of specific intents and one is able to generalize about their common denominator characteristics. This entire class or category of crimes involving more remote intentions or purposes has been thoroughly

discussed and analyzed by Judge Eldridge in *Shell v. State,* 307 Md. 46, 63–65, 512 A.2d 358 (1986) and by this Court in *Smith v. State,* 41 Md.App. 277, 305–06, 398 A.2d 426 (1979) and *Wieland v. State,* 101 Md.App. 1, 35–38, 643 A.2d 446 (1994).

Article 27, Sect. 36(a)'s specific "intent or purpose of injuring any person" is simply a particular instance of that generic category. Where there is such an additional mental element, a defendant is fully entitled to have the jury instructed as to the necessity that it find such an element in order to convict. In this case the jury was so instructed. It was instructed with respect to the additional mental element in the detailed and particularized language pertinent to the case at hand rather than in more abstract and generalized terms. When Judge Shepherd twice told the jury that, in order to convict, it would have to find that the appellant carried a dangerous weapon openly "with the intent to injure another person," he defined precisely the only specific intent that was before the jury for its consideration. He did not ignore the mental element of specific intent. He spelled it out—twice.

Having done everything that was required in the particular, there was no requirement that he, in the course of doing so, use the generic adjective "specific." There is no talismanic magic in the incantation of the phrase "specific intent." It is an academic term of art, not a mantra. What matters is that the definition of the required intent **BE SPECIFIC,** not that it necessarily **DESCRIBE ITSELF AS BEING "SPECIFIC."**[2] We are concerned with what the definition actually **DOES,** not with what it **SAYS IT DOES.**

---

2. Contrast two hypothetical jury instructions. In the first, the jury is advised that it cannot convict unless it finds that the defendant uttered the fraudulent document "with the intent that the victim rely on its authenticity and, based on that reliance, sign over the farm to the defendant." In the second, the jury is advised that it cannot convict unless it finds that the defendant uttered the fraudulent document "with the specific intent that the crime would succeed." The first defines a specific intent without ever using the word "specific." The second fails

The Comment to MPJI Cr–3:31.1 catalogues 45 Maryland crimes requiring proof of a specific intent. In each of the 45 pattern jury instructions spelling out what must be found in those respective cases, the individual specific intent involved is described in the particularized language appropriate to that particular intent. Not once over the course of those 45 pattern instructions is the generic adjective "specific" ever employed. The utility of such an adjective is obviated by an instruction that is, in its very articulation, *specific*. A precise description of the species eliminates any need to designate the genus. There was no error in the jury instruction in this case. The definition, in fact, was specific whether it ever used the word "specific" or not.

With respect to the trial of the offenses committed against Teresa Hicks (No. 0445), Judge Shepherd also gave the jury MPJI–Cr 4:35. In that trial, however, the appellant made no objection to the instruction as given nor had he requested any special instruction. With respect to that set of convictions, therefore, there is nothing properly before us for review. Were the issue before us, it is inconceivable that our resolution of it would be different than is our resolution of the same issue as we review the other two sets of convictions. No matter how easy it would be to do so, however, we once again steadfastly refuse to compromise the integrity of the preservation requirement. *Stockton v. State*, 107 Md.App. 395, 396–98, 668 A.2d 936 (1995). Whatever we may intimate about the merits, we hold nothing.

### The Merger of the Second–Degree Assaults

 In his final contention, the appellant claims that his convictions in each case for the lesser included offense of second degree assault should have merged into his respective convictions for the greater inclusive offenses of 1) the third degree sexual offense against Teresa Hicks (No. 0445), 2) the

---

to define a specific intent, notwithstanding the use of the word "specific."

attempted armed robbery of Madinah Rasheed (No. 0447), and 3) the armed robbery of Martha Yates (No. 0448).

As a matter of fact, the merger of the second degree assault conviction in Case No. 0448 (the crimes against Martha Yates) did take place. At the time of sentencing, Judge Shepherd ruled that the assault conviction was merged into that for armed robbery.

With respect to the other two cases, the appellant is right. The assault was an integral part of the third degree sexual offense in Case No. 0445, just as it was an integral part of the attempted armed robbery in Case No. 0447. Commendably, the State agrees that these mergers were mandatory.

**IN CASE NO. 0445, SECOND DEGREE ASSAULT CON-VICTION VACATED AND MERGED INTO CONVICTION FOR THIRD § DEGREE SEXUAL OFFENSE;**

**IN CASE NO. 0447, SECOND DEGREE ASSAULT CON-VICTION VACATED AND MERGED INTO CONVICTION FOR ATTEMPTED ARMED ROBBERY;**

**ALL OTHER CONVICTIONS AFFIRMED;**

**COSTS TO BE DIVIDED EQUALLY BETWEEN THE APPELLANT AND PRINCE GEORGE'S COUNTY.**