809 A.2d 66

Michael H. MINEHAN

v.

STATE of Maryland.

No. 2043, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Oct. 1, 2002.

Robert C. Bonsib (Beau Kealy and Marcus & Bonsib, on the brief) Greenbelt, for appellant.

Shanon E. Avery, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Douglas Gansler, State's Attorney for Montgomery County of Rockville, on the brief) for appellee.

Argued before SONNER, DEBORAH S. EYLER, and KRAUSER, JJ.

SONNER, Judge.

In April and May of 1999, the police investigated a rash of armed robberies of commercial establishments in Montgomery County. The result of the investigation was a twenty-count indictment, with various permutations of robbery, conspiracy, assault, and use of a handgun, charging Michael H. Minehan with participating in the robberies as the driver of the getaway car.

The indictment resulted in three trials, two of which were jury trials and one of which was a bench trial. The first jury convicted Minehan of robbery with a deadly weapon, use of a handgun in the commission of a felony, conspiracy to commit robbery with a deadly weapon, and robbery. All of those offenses stemmed from the robbery of a restaurant, Sole D'Italia, on May 12, 1999. Minehan was acquitted of some of the other charges in the indictment by a second jury, as well as by the circuit court in the first jury trial. Then, the circuit court in the bench trial convicted him of three counts of robbery with a deadly weapon. The State nol prossed the remaining charges. Consolidating all the guilty verdicts, the circuit court sentenced Minehan to twelve years' incarceration.

On appeal, Minehan asserts that we must reverse all of the convictions because the trial court accepted an unlawful confession. He also argues the court improperly allowed evi-

dence of his other crimes during the first jury trial. Next, Minehan challenges the sufficiency of the evidence for the jury's convictions of robbery with a deadly weapon and use of a handgun. Finally, Minehan alleges that, during the first jury trial, the judge erroneously limited defense counsel's cross-examination of a key witness. We find no reversible error and affirm the judgments.

## I. The Confession

The suppression hearing is our source for learning what happened before, during, and after Minehan's confession. *Facon v. State,* 144 Md.App. 1, 19, 796 A.2d 101, *cert. granted,* 369 Md. 570, 801 A.2d 1031 (2002). Moreover, we must view the evidence from that hearing in a light most favorable to the State because it prevailed in the trial court on the motion to suppress. *Id.* at 20, 796 A.2d 101.

Detective Gene Curtis of the Montgomery County Police Department developed Minehan as a suspect in the robberies in late May 1999. The biggest tip came from Marcos Columba, who was the man suspected of effectuating the actual holdups. At the same time, the D.C. Metropolitan Police Department was investigating a robbery at Johnson's Flower Shop, where Minehan worked. Indeed, Minehan was the alleged victim of that crime. Police suspected Columba's involvement in the florist robbery, and given Columba's admitted relationship with Minehan, they suspected Minehan knew a great deal more about that robbery than he had expressed. Accordingly, the police devised a plan to question Minehan about the florist robbery as a gateway to a larger discussion of his involvement in the serial robberies. Minehan was one month shy of twenty-three years of age and did not have a criminal record.

As the first step in the plan, police discussed their suspicions with Minehan's superiors at the flower shop and learned his work schedule. They hoped to confront Minehan before he had an opportunity to speak with other suspects and "think a whole lot" about the investigation. It also is clear that they wished to interrogate him in a manner that would not be

viewed as custodial and trigger *Miranda* rights. Accordingly, on June 3, 1999, at 8:30 in the morning, three police officers, including Detective Curtis, arrived at the florist,[1] wearing civilian clothes. Detective Curtis testified that he approached Minehan, along with another officer and Minehan's employer, and asked to speak with him at the police station about the florist robbery. Minehan assented "willingly." The officers followed him around the shop as he completed his work and walked out with him.

According to Detective Curtis, although Minehan's car was parked in the florist lot, he assented to the officers' suggestion that he drive with them to police headquarters in an unmarked police vehicle. Apparently, one of the officers patted him down before he got into the car, which Detective Curtis described as "normal" police procedure. Notwithstanding defense counsel's prodding at the suppression hearing, Detective Curtis could not remember exactly what the men discussed in the car, although "it was something about the D.C. case."

At police headquarters, the officers escorted Minehan to a room established for interviewing victims and witnesses. They intentionally did not use the room set aside for the interrogation of suspects. He sat at the head of a long table with the three officers facing him. The taped interview began at 9:19 a.m., was interrupted for twenty minutes for Minehan's cigarette break, and ended less than two hours later at 11:00 a.m. He began his incriminating remarks about a quarter of the way into the interview. The officers deliberately did not advise Minehan of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Following the confession, the officers obtained Minehan's permission to collect evidence at his home. That effort, however, was unsuccessful, so the officers proceeded to drive

---

1. The alleged robbery occurred at Johnson's Flower Shop in Washington, D.C. However, when police later confronted Minehan on June 3, 1999, he was working at Johnson's Flower Shop in Kensington, Maryland.

Minehan to his car at the florist parking lot. He was arrested one week later, on June 10, 1999.

## A. Was Minehan Subject to Custodial Interrogation?

By dictate of *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, an accused's statement cannot be used against the accused at trial if it was the product of "custodial interrogation" and the police did not inform the accused of certain habitual warnings before taking a statement. "The constitutional distillate of *Miranda* is that self-incrimination flowing from a custodial interrogation is, *ipso facto, compelled* self-incrimination because of the inherent coercion—the inherent compulsion—of the custodial interrogation environment." *Cummings v. State*, 27 Md.App. 361, 366, 341 A.2d 294 (1975); *see also Dickerson v. United States*, 530 U.S. 428, 433, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (discussing the constitutional roots of *Miranda* ).

Minehan asserts that his confession was invalid because it was the product of custodial interrogation minus *Miranda* warnings. Clearly, his interview met the interrogation requirement as the police directed questions to him, with the sole purpose of eliciting incriminating information. *See Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Drury v. State*, 368 Md. 331, 335–36, 793 A.2d 567 (2002). The circuit court, however, found that Minehan was not in custody for purposes of *Miranda*, a finding we uphold after examining several cases and closely reading the transcript of the interrogation.

Custody means a formal arrest, or another serious restriction on freedom of movement. *See Miranda*, 384 U.S. at 477, 86 S.Ct. 1602. It is an objective state that is entered when a suspect is "led to believe, as a reasonable person, that he is being deprived or restricted of his freedom of action or movement under pressures of official authority." *Bond v. State*, 142 Md.App. 219, 228, 788 A.2d 705 (2002) (citations

omitted) (holding that defendant was in custody when police questioned him in his bedroom, late at night).

 Practically speaking, we must consider:

where the interrogation occurred, its length, the number of police officers present, what the officers and the suspect said and did, whether the suspect was physically restrained, whether there was a show of force, *i.e.*, weapons drawn or a guard at the door, and whether the suspect was being questioned as a suspect or as a witness.

*Id.* at 229, 788 A.2d 705; *see also Whitfield v. State,* 287 Md. 124, 141–42, 411 A.2d 415 (1980) (applying the factors and finding custody). We will also take note of how the suspect came to the place of questioning, as well as whether police let the person leave at the end of the interview or executed an arrest. *Id.* What are not factors are the officer's or the accused's subjective opinion as to whether there has been custody. *Bond,* 142 Md.App. at 228, 788 A.2d 705; *see also Ashe v. State,* 125 Md.App. 537, 551, 726 A.2d 786 (1999).

 Preliminarily, we note that Minehan was not in custody during the drive to police headquarters. Accepting the evidence in a light most favorable to the State, as we must, the facts were that Minehan agreed to accompany the officers in their car; he was not restrained, except for having to wear a seatbelt; and the conversation in the car was unremarkable. These are not the facts of *United States v. Ceballos,* 812 F.2d 42, 45 (2d Cir.1987), in which law enforcement agents refused a suspect's request to follow them in a company car to the interrogation site. As the federal court found, the agents' refusal would have made a reasonable person feel obligated to accompany them. *Id.* at 48. Nor is this case like *Myers v. State,* 3 Md.App. 534, 535–36, 240 A.2d 288 (1968), in which a police vehicle essentially became an interrogation room, where the suspect was confined and questioned.

 As for Minehan's interview at the police station, we recognize that each case must be judged on its own merits, although certain benchmarks have developed in the thirty-plus years of *Miranda* litigation. For example, interrogation in a

police station does not amount to custody *per se*. *See Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983); *Ashe,* 125 Md.App. at 551, 726 A.2d 786. As the Supreme Court explained in *Mathiason,* 429 U.S. at 495, 97 S.Ct. 711:

> Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question.

Another established rule is that police do not violate *Miranda* by telling the accused he or she is only a witness, when, in fact, the person is a suspect. *Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711; *see also Beckwith v. United States,* 425 U.S. 341, 347, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1976); *Cummings,* 27 Md.App. at 379–80, 341 A.2d 294. Police may also exaggerate the evidence they have accumulated against the person being interviewed. *See Mathiason,* 429 U.S. at 495–96, 97 S.Ct. 711.

A third factor, perhaps most important for this case, is that there is rarely custody when the person questioned leaves the interrogation unencumbered, only to be arrested at a later time. *See Bartram v. State,* 33 Md.App. 115, 148–49, 364 A.2d 1119 (1976); *Cummings,* 27 Md.App. at 378–79, 341 A.2d 294; *see also United States v. Scully,* 415 F.2d 680, 683–84 (2d Cir.1969) (holding that accused was not in custody when asked to go to the police station and left the station freely); *United States v. Manglona,* 414 F.2d 642, 644 (9th Cir.1969) (holding that accused was not in custody when told he was not under arrest and was free to leave, and did in fact freely leave the interview); *State v. Patterson,* 146 N.C.App. 113, 552 S.E.2d 246, 252–54 (2001) (holding that accused was not in custody when asked to "give his side of the story" and then left the station unencumbered).

All three of the factors discussed above weigh against a finding of custody in Minehan's case. Adding further weight, we note that, at the beginning of the interview, Minehan stated on the record, "I came on my own free will," and the officers told him that he was free to leave and that he did not have to answer any questions. Moreover, before Minehan confessed, the officers again told him that he was not under arrest and that he could "leave and not say a thing." After the confession, Detective Curtis further explained, "You are not ... under arrest. We are going to let you go. We will probably be contacting you to maybe discuss things here in the future." These statements support a finding that Minehan was not in custody.

We recognize that bringing Minehan to the police station to discuss the florist robbery was clearly a subterfuge for extracting a confession from him. Furthermore, once the officers shifted the interview from the florist robbery to Minehan's alleged criminality, the pressure in the room increased, a change that is palpable from reading the transcripts and which was captured by Minehan's anxious question, "What is happening to me?" With a slightly different set of facts, this police action would have jeopardized the admission of the entire confession; it was a risky enterprise. Given Minehan's unencumbered departure and his statements on the record, however, we uphold admission of the confession, after all.

 It is also clear that the police undertook a deliberate and calculated strategy to avoid placing Minehan in custody, so as to impede the attachment of the right to counsel and the important consequences that would have flowed from the attachment of that right. A suspect, however, has no right to be placed in custody and to benefit from the heightened procedures that attach to a formal arrest. *Hoffa v. U.S.*, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

## B. Did Police Violate Minehan's Right to Counsel?

 Our holding that Minehan's confession was not the product of custodial interrogation, and, accordingly, that *Mi-*

*randa* rights did not attach, disposes of his alternative claim that the confession was invalid because police ignored his invocation of the right to counsel. He directs us to his question, "Should I get a lawyer?," which he uttered moments before confessing. There is indeed a right to counsel rooted in both the Fifth and Sixth Amendments of the U.S. Constitution. The Sixth Amendment right, however, attaches only when formal charges have been filed. *See Massiah v. United States,* 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). And the Fifth Amendment right to counsel is part of the constitutional protection against compelled self-incrimination. *Miranda,* 384 U.S. at 469, 86 S.Ct. 1602; *see also Raras v. State,* 140 Md.App. 132, 153, 780 A.2d 322 (2001). Since Minehan was not subject to compelled self-incrimination, he had no right to counsel, pursuant to *Miranda.*

We note further that, even if a Fifth Amendment right to counsel had attached to the situation, Minehan would have had to invoke that right "unambiguously." *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994); *see also Matthews v. State,* 106 Md.App. 725, 737–38, 666 A.2d 912 (1995). In *Davis,* 512 U.S. at 462, 114 S.Ct. 2350, the U.S. Supreme Court rejected the phrase, "Maybe I should talk to a lawyer." *See also United States v. Ford,* 51 M.J. 445, 452 (1999) (no invocation of Fifth Amendment right when suspect stated, "Maybe I should get a lawyer"); *State v. Salinas,* 124 Ohio App.3d 379, 706 N.E.2d 381, 386 (1997) (no invocation when suspect stated, "Maybe I want a lawyer, maybe I should talk to a lawyer"). Minehan's question, "Should I get a lawyer?," was no more effective in invoking a Fifth Amendment right to counsel than the question in *Davis.*

## C. Was Minehan's Confession Voluntary?

 Having concluded that the confession abided the dictate of *Miranda,* we must nevertheless determine whether it was voluntary. *See Winder v. State,* 362 Md. 275, 305–06, 765 A.2d 97 (2001) (reiterating that a confession is admissible only if voluntary under Maryland non-constitutional law, and U.S. and Maryland constitutional law). In that task,

[w]e look to all of the elements of the interrogation to determine whether a suspect's confession was given to the police through the exercise of free will or was coerced through the use of improper means. On the non-exhaustive list of factors we consider are the length of the interrogation, the manner in which it was conducted, the number of police officers present throughout the interrogation, and the age, education and experience of the suspect. Maryland law requires that "no confession or other significantly incriminating remark allegedly made by an accused be used as evidence against him, unless it first be shown to be free of any coercive barnacles that may have attached by improper means to prevent the expression from being voluntary."

*Winder*, 362 Md. at 307, 765 A.2d 97 (citations omitted).

■ As we understand Minehan's position, he believes his confession was involuntary because the officers induced him to confess with: (1) the carrot of non-prosecution; and (2) the threat of being in a "precarious position" if he did not talk to them. Again turning to *Winder*, 362 Md. at 305, 765 A.2d 97, we find the general principles for addressing both claims:

While we permit the police to make appeals to the inner conscience of a suspect and use some amount of deception in an effort to obtain a suspect's confession, when the police cross over the line and coerce confessions by using improper threats, promises, inducements, or psychological pressures, they risk loss of the fruits of their efforts. Confessions produced through such measures will be suppressed.

Next, to specifically analyze Minehan's claim that he was induced to confess with promises of leniency, we turn to *Hillard v. State,* 286 Md. 145, 153, 406 A.2d 415 (1979), in which the Court of Appeals stated:

[I]f an accused is told, or it is implied, that making an inculpatory statement will be to his advantage, in that he will be given help or some special consideration, and he makes remarks in reliance on that inducement, his declaration will be considered to have been involuntarily made and therefore inadmissible.

The detective in *Hillard* told the accused he would "go to bat" for him if he confessed. *Id.* In the Court's view, the confession that resulted from this inducement was unreliable and could not be used at trial. *Id.* at 153–54, 406 A.2d 415; *see also Winder*, 362 Md. at 313, 765 A.2d 97.

Minehan sees a parallel between his interrogation and the one in *Hillard*, which we do not see. The officers interviewing Minehan never promised they would advocate on his behalf in exchange for a confession. To the contrary, Detective Curtis warned Minehan before he confessed, "I can't promise you that you are going to stay out of trouble." And after the confession, the detective explained:

> Well, I will just tell you concerning Montgomery County, okay, we will meet with the State's Attorney's Office, and they will make a decision about what will happen as far as charging purposes; okay—if you will be charged with something, or you will be a witness?
>
> We will present them the facts, what you have told us. They will listen to these tapes. They will take it all into consideration, and they will make some kind of determination.
>
> I don't know what they will do or what they want to do at this point; okay? I can't promise you anything obviously; okay, but your honesty goes a long way, okay and that is the bottom line here; okay?

With these admonitions, Minehan could not reasonably believe the officers would ensure his case was handled with leniency. *See Winder*, 362 Md. at 311, 765 A.2d 97 ("a suspect's subjective belief that he or she will be advantaged in some way by confessing will not render the confession involuntary").

As for Minehan's claim that the officers wrangled a confession from him with bullying tactics, he directs us to the beginning portion of the interrogation, when police were questioning him about the alleged robbery at Johnson's Flower Shop. Police believed that an individual named "Tay" committed that holdup, based upon Tay's confession and Columba's statement of events. Even faced with this information, how-

ever, Minehan continued to deny Tay's involvement in the crime. Thereafter, one of the officers in the interrogation room said to him:

> If Tay did rob the place, and we find out that you are a co-conspirator, which I don't believe. I believe that you may have been forced into some things. I need to know now before we leave this room because everything changes once I leave this room.

Detective Curtis then told Minehan that by denying Tay's involvement, he was "putting [him]self in a precarious position."

These comments from the officers concerned Minehan's statement about the florist robbery, a crime for which he was an alleged victim and witness, not an alleged suspect. We agree with the trial court, and are not convinced that Minehan reasonably felt threatened to confess his criminal activities based on the officers' chiding about his statement as a witness to another crime. Moreover, the officers' statements, although perhaps hostile in tone, did not rise to the level of improper threats.

## II. The Other Crimes Evidence

Minehan's first jury trial concerned the armed robbery at Sole D'Italia. Naturally, the question arose whether the State could introduce testimony about the other robberies at that trial. Initially, the defense presented a motion *in limine*, requesting that the other crimes evidence stay out, but the court deferred ruling on the matter. Then, on the second day of trial, after back-and-forth argument from counsel, the court ruled:

> I will deny the request for motion *in limine*, which does not preclude you from objecting to evidence when it is presented or to suggest at that time that it doesn't rise to the level of clear and convincing, but ... I will deny any motion to preclude other crimes evidence to show intent or knowledge.

The court then granted defense counsel a continuing objection to the admission of other crimes evidence derived from Minehan's statement or accomplice testimony.

The issue resurfaced during the direct examination of Marcos Columba, who served as a State witness. He detailed how his relationship with Minehan developed, as well as the evolution of their decision to commit the robberies. The prosecutor then guided Columba through the crimes, asking specific questions about when and where each one occurred. The defense did not object to the admission of this evidence, relying, presumably, on the continuing objection, until the prosecutor asked Columba why he had targeted a certain commercial establishment. At that point, defense counsel stated:

> Your Honor, I don't believe that under other crimes that ... the State is allowed to go into intimate details here.
>
> If they want to establish that Mr. Minehan had had some conversation, that he participated in other events to show intent and knowledge, fine; but I think the law ... is that you are not allowed to go into essentially reproving these [crimes].

The court cautioned the State not "to get into a complete trial on it," and Columba's testimony continued with a few sporadic objections to the same effect.

On appeal, Minehan challenges the admission of the evidence, and argues that its probative value did not outweigh its prejudice. We, however, first must determine whether he preserved this issue, after the court denied his motion *in limine*. Because he acted pursuant to the court's having granted a continuing objection, which engendered belief he had preserved the objections for appeal, it is only fair that we consider the merits of Minehan's contention. This case is different from *Oesby v. State*, 142 Md.App. 144, 162 n. 1, 788 A.2d 662 (2002), where the defendant "inexplicably" failed to renew his objection following the denial of his motion *in limine*.

As for the merits of the claim, a basic tenet of our legal system is that other crimes evidence is not admissible "to show action in conformity therewith." Md. Rule 5–404(b). Such evidence, however, may be admissible to show "proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident." *Id.* "The label we put on an exception ... is not that important, just so long as the evidence of 'other crimes' possesses a special or heightened relevance and has the inculpatory potential to prove something other than that the defendant was a 'bad man.' " *Oesby,* 142 Md.App. at 162, 788 A.2d 662.

We uphold the admission of the other crimes evidence here, based on the established paradigm revisited in *Oesby,* 142 Md.App. at 162–67, 788 A.2d 662. First, evidence of Minehan's involvement in the other robberies had "special relevance" to show Minehan's intent to commit, and knowledge of, the armed robbery at Sole D'Italia. Second, there was clear and convincing proof of the other crimes from Columba's testimony and Minehan's own statement. Finally, we find no abuse of discretion in the court's determination that the evidence was more helpful than harmful, that is, more probative than prejudicial.

### III. The Handgun Evidence

Marcos Columba testified that he used a gun to commit the Sole D'Italia robbery. The waitress at Sole D'Italia, Molly Bragg, further testified that she assumed Columba carried a gun because she saw the outline of a gun inside Columba's shirt pocket. Contrary to Minehan's position, these testimonials supported the convictions for robbery with a deadly weapon and use of a handgun in the commission of a felony. A conviction must be upheld if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *see also Winder v. State,* 362 Md. 275, 325, 765 A.2d 97 (2001).

Surely, given Columba's admission and Bragg's circumstantial testimony, that standard has been met for both convictions.

It is true, as Minehan argues, that the handgun conviction was valid only if there was sufficient evidence that the weapon used was a handgun, as opposed to a rifle or a shotgun. *See Gerald v. State*, 137 Md.App. 295, 309–11, 768 A.2d 140 (2001); *Manigault v. State*, 61 Md.App. 271, 287, 486 A.2d 240 (1985). Bragg's testimony, however, that Columba's gun fit in his shirt pocket—what she described as a "kangaroo pocket"—satisfied that burden of proof. *See Manigault*, 61 Md.App. at 287, 486 A.2d 240 (sufficient evidence of handgun violation when witness testified that the accused's hand covered most of the gun that he carried). Moreover, Columba identified a pistol as the "spitting image" of the gun he used in the robberies.

We also reject Minehan's contention that these weapon convictions must be overturned because the trial court granted his motion of acquittal as to other weapon charges stemming from the Sole D'Italia robbery. The acquitted charges, robbery with a deadly weapon and use of a handgun in the commission of a felony, applied to the alleged victim Geoff Adler, who opened the register and handed money to Bragg for her to turn over to Columba. The evidence was unclear as to whether Adler knew Columba was robbing the restaurant, and, if he did, whether he saw Columba's weapon. But, whereas the State may not have been able to prove the elements of the weapon crimes as they applied to Adler, it was able to prove the crimes as they applied to Bragg. Accordingly, the court's acquittal of the Adler charges in no way dictated acquittal for the Bragg charges.

### IV. Columba's Fifth Amendment Right

In the first jury trial, Columba invoked his Fifth Amendment right against self-incrimination when Minehan's attorney sought to question him about how he obtained the gun used in the robberies. According to Minehan, Columba stole the firearm from a gun store, information that could have weakened Columba's credibility in the eyes of the jury. None-

theless, the court respected Columba's invocation and barred defense counsel from questioning him further on the subject.

We uphold that determination, recognizing that the trial court has "broad discretion" in controlling the scope of cross-examination. *Martin v. State,* 364 Md. 692, 698, 775 A.2d 385 (2001). Here, Columba's assertion of his Fifth Amendment right presented the court with a "collision of two closely protected constitutional rights: the Fifth Amendment privilege against compulsory self-incrimination and the Sixth Amendment right to call witnesses to testify in one's behalf." *Horne v. State,* 321 Md. 547, 553, 583 A.2d 726 (1991) (citing *Kastigar v. United States,* 406 U.S. 441, 444–45, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972)). The court correctly ruled that Columba's Fifth Amendment privilege prevailed. *Id.*

Thus, Minehan's seven convictions stand. His confession was voluntary and not subject to *Miranda,* and the trial court ruled appropriately on evidentiary matters in the first jury trial.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED;**

**APPELLANT TO PAY COSTS.**