909 A.2d 1069

**Richard David HURST**

v.

**STATE of Maryland.**

**No. 1951 Sept. Term, 2004.**

Court of Special Appeals of Maryland.

Oct. 26, 2006.

Claudia A. Cortese (Nancy S. Forster, Public Defender, on brief), Baltimore, MD, for Appellant.

Celia Anderson Davis (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: SALMON, ADKINS and MEREDITH, JJ.

SALMON, Judge.

Appellant, Richard David Hurst, was convicted by a jury sitting in the Circuit Court for Frederick County of first-degree rape, second-degree rape, first-degree sexual offense,

second-degree sexual offense, kidnapping, and false imprisonment. He was sentenced to life imprisonment, without the possibility of parole, for the first-degree rape; life imprisonment, with the possibility of parole, for the first-degree sexual offense; and thirty years' imprisonment for the kidnapping. The remaining convictions were merged for purposes of sentencing. All sentences were to run concurrently. Appellant noted a timely appeal and presents two questions for our review:

I. Did the trial court abuse its discretion in admitting other crimes evidence?

II. Did the trial court abuse its discretion in denying appellant's request for a postponement?

## I. *FACTS*

### A. *Uncontroverted Facts*

On the evening of May 16, 2002, appellant had vaginal intercourse with Gertrude P., and on the same date, Ms. P. performed fellatio on appellant. Ms. P. testified that appellant forced her to have sex with him. Appellant testified that the sex was consensual.

In May 2002, Ms. P., forty, lived on one side of a duplex in Hagerstown; her brother, John, lived on the other side. She was mentally challenged, yet for the most part, she was able to live independently.

On May 16, 2002, she spent most of the day obtaining job applications at various fast-food restaurants in the Valley Mall located in Hagerstown. It was dark when she finished, and because she believed she had missed the last bus to her home, she began walking on Wessel Boulevard in the direction of her home.

### B. *Ms. P's Testimony*

As she walked along Wessel Boulevard, Ms. P. noticed a truck on the opposite side of the roadway. Appellant, whom she did not know, was the truck driver. Appellant asked Ms.

P. for directions to Frederick. Ms. P. told appellant that she was "not very good at giving directions" and asked appellant to "please go to the gas station and ask the cashier to give . . . directions."

Appellant drove off, but returned shortly thereafter. This time, his truck was on the same side of the road as Ms. P. Ms. P. approached the truck, and appellant again asked for directions to Frederick. Ms. P. attempted to give appellant directions, but he suggested that she show him how to get to that destination. She obliged by getting into the truck with appellant. After Ms. P. was seated, appellant identified himself as "Christopher Cane" and locked the doors of his vehicle.

As appellant drove, Ms. P. gave appellant directions to Frederick. Eventually, however, he stopped following those directions. This caused her to feel "very uncomfortable." As the two drove along Route 40, she saw a Sheetz Store and asked appellant to pull into the parking lot of the store because she had to use the bathroom. Appellant refused to stop, and thereafter the truck passed a "welcome to Frederick" sign.

During the trip, appellant brought up the topic of having sex. Ms. P. did not want to talk about that subject so that conversational gambit reached a dead end.

Appellant eventually turned his truck off Route 40 onto Hollow Road and then into a wooded area. After appellant stopped the truck, he unlocked the doors and told Ms. P. to get out. She complied. Appellant then walked to her side of the vehicle and told Ms. P. that he would not hurt her, but that he had a knife and, if she struggled, he would hurt her.

Appellant placed one hand around Ms. P.'s shoulder and neck and the other behind her back. Appellant then started "dragging" her down a hill. She fell and struck her back on sticks that were laying on the ground.

At the bottom of the hill, appellant told Ms. P. to get on the ground, "spread her legs a little," and pull down her pants and underwear. Ms. P. complied because appellant told her that if

she did not do what he said, he would hurt her. While restraining Ms. P., appellant forced Ms. P. to perform fellatio. Appellant next engaged in non-consensual vaginal intercourse with Ms. P. During these sexual acts, appellant placed his hand over Ms. P.'s mouth so that she could not scream.

After the rape, appellant told Ms. P. to get dressed and to get into the truck. She dressed, and appellant offered to take her to the Sheetz Store.

At that point Ms. P. did not know where she was and was afraid of appellant so she got back in the truck. Appellant then drove back toward Hagerstown. As they approached the Sheetz store, appellant gave Ms. P. a $20.00 bill, saying the money was "for sex." He also said, "Don't tell no one about this." Ms. P. did not ask for or want the money.

Ms. P. nevertheless took the money, got out of the truck, and went into the Sheetz Store. One of the cashiers then noticed that she was crying, found out why, and called the police.

### C.  *Testimony of Cindy Wagner*

Cindy Wagner was working at the Sheetz Store when she observed Ms. P. enter. According to Ms. Wagner, Ms. P. "was standing there all excited looking, and I noticed she [had] messed up hair and her clothes were wrinkled and dirty ... so I went up and asked her if I could help her." Wagner added: "Well she was so hyper, and I knew she, there must have been something wrong with her mentally because she acted like a child ten- or eleven-years old, and she had tears in her eyes." After Ms. P. explained what had happened, Ms. Wagner asked her if she would like her to call the police. Ms. P. responded in the affirmative.

Ms. P. told Ms. Wagner that she was getting ready to go home from the store when a man offered her a ride home. The man did not take her home but, instead, drove to the woods by Hollow Road and "made her do things she didn't want to do." Ms. P. told Wagner that she repeatedly told the

man "No," but that he nevertheless "grabbed her head and put it down there, put her mouth down there."

## D. *Testimony of Police Officers*

Deputy Brian Miller, who was employed by the Washington County Sheriff's Office in May of 2002,[1] talked to Ms. P. on the night of the alleged sexual assault. During his interview, the deputy noticed that Ms. P. had "slightly red marks all around ... the front of her neck." The deputy transported Ms. P. over the Frederick County line where they met with a deputy from Frederick County because Ms. P. said that the assault occurred in Frederick County.

Deputy First Class Paul Collantuno of the Frederick County Sheriff's Office met Deputy Miller and Ms. P. at the Washington County/Frederick County line. To Deputy Collantuno, Ms. P. appeared to have "a mental deficiency." He added that her speech was "very labored," she "stuttered a lot," and she had "facial ticks." Nonetheless, Ms. P. was able to tell the deputy that she had been on foot in the Hagerstown area when a brand new pick-up truck passed her by, circled around, and that the driver of the pick-up asked for directions to Frederick County. The driver told Ms. P. he was forty-seven-years old and that his name was Christopher Cane. He also told her that he would give her $20 or $30 if she showed him how to get to Frederick County. Ms. P. agreed to do so and got into the truck. Once she was in the truck, Ms. P. told the driver to get onto Interstate 70, but he did not do so. They then drove past the Sheetz Store on Route 40. Ms. P. asked the driver to stop at the store, but he refused.

Ms. P. told Deputy Collantuno that she recalled seeing a "Welcome to Frederick" sign and later a sign for Hollow Road and that the pick-up truck stopped a short distance later in a grassy area. Ms. P. reported that the driver then told her "to do what she was told to do or else she'd get hurt." After they got out of the truck, the driver forced her to perform oral sex

---

1. At the time of trial, Deputy Miller was employed by the Allegheny County Sheriff's Office.

on him even though she told him that she did not want to do it and did not like it. The driver then forced her to the ground and had vaginal intercourse with her. She told the driver to stop and that it hurt. Ms. P. also reported that she believed that the driver had a knife. She did not, however, say that she saw the knife, just that she believed he had one.

Ms. P. also reported to Deputy Collantuno that, following the assault, she and the driver got back into the pick-up truck, and she was driven to the Sheetz Store where she got out of the truck. The driver gave Ms. P. $20 for a taxi ride. After giving her statement, Ms. P. was transported to Frederick Memorial Hospital.

### D. *Testimony of Kim Day, R.N.*

Kim Day, a registered nurse employed at Frederick Memorial Hospital, was qualified as an expert witness. On May 17, 2002, at 2:50 a.m., she came in contact with Ms. P. at the hospital emergency room. Ms. P. was "childlike," "apprehensive, frightened" and appeared to be a person who did not understand a lot of the terminology she (Ms. Day) used.

Ms. P. informed Day that she had driven with Christopher Cane from Hagerstown to Frederick County and then to a wooded area on Hollow Road, where "Cane" "[d]id something to me that I didn't ask for." Ms. P. also indicated that Cane told her that he had a pocket knife, but that he did not attack her with the knife. When they were in a field, Cane told Ms. P. that if she did not cooperate, he would hurt her. Cane then told her to put her mouth on his penis. Ms. P. told Cane that she was "against it" and that she "didn't like that." Cane also pulled her pants down. He told her that if she tried to scream he would put his hand over her mouth. At one point, cars drove by which caused Cane to put his hand over her mouth so she could not scream. She told Cane during intercourse that it hurt, and he stopped. Afterward, "Cane" gave Ms. P. $20.00 for a ride home and dropped her off at Sheetz.

Upon Day's examination of Ms. P., the nurse observed leaves and sticks on Ms. P.'s clothing. Day also noticed

several injuries, including an abrasion or scratch under her left breast and "[r]ed, raised[,] ... linear pattern injuries" on the inside of her left wrist. On Ms. P.'s right flank, there were two linear pattern injuries of five and eight centimeters in length that were red and raised. Day opined that the injuries were consistent with a scrape to the back. Ms. P. also had multiple "punctate lesions" on her buttocks, as if she had been lying on something sharp. Day opined that the linear patterns appeared to have been caused by Ms. P. lying on something "like a twig or something like that...." There was also a bruise to the back of Ms. P.'s leg. All the injuries were "fresh."

Ms. P. complained of pain in the vaginal area. Upon conducting a genital exam, Day noticed that there was bleeding from the vagina and that there were two broken blood vessels in the vaginal area. Day opined that the ruptured blood vessels were "consistent with her [Ms. P.'s] history of the event." Oral and vaginal swabs were collected from Ms. P.

### E. *Testimony of Corporal Buyers*

Corporal Eric Buyers of the Frederick County Sheriff's Office testified that he responded to the hospital and interviewed Ms. P. He noted that she was "very withdrawn," "very meek," and that "she was of limited mental capacity." Ms. P. related to Corporal Buyers her version of what occurred. This version was, in all material respects, the same as what Ms. P. told Nurse Day.

### F. *DNA Test*

In November of 2003, the police developed appellant as a suspect in the rape of Ms. P. A search warrant was executed, and oral swabs were obtained from him. Regarding the DNA analysis performed on those swabs and the swabs obtained from Ms. P.'s vaginal area, the State and the defense agreed to the following stipulation, which was read to the jury:

The ... DNA profile obtained from semen identified on the first vaginal swab matches the DNA profile obtained

from the known standard of Richard David Hurst. Therefore, within reasonable degree of scientific certainty Richard David Hurst is a contributor to the DNA profile obtained on the first vaginal swab. The probabilities of selecting an unrelated individual at random having a DNA profile matching the DNA profile obtained from the first vaginal swab are one and 470.0 quadrillion using U.S. Caucasian population database.

## II. *APPELLANT'S TESTIMONY*

Appellant testified that he lived with his fiancé in Boonsboro and that, on the evening of May 16, 2002, he was driving in the area of Valley Mall when he saw Ms. P. walking alongside the road heading toward Hagerstown. She was walking "real slow" and would stop to play with leaves and branches on the trees and then would start walking again. He made a U-turn, which put him on the same side of the road as Ms. P. He again saw her playing with the leaves and branches, which made him uncertain as to whether she was "trying to get picked up. . . ."

Appellant, who had previously seen prostitutes in the area, pulled up beside Ms. P. and said, "Excuse me, ma'am, do you know where Frederick is?" Ms. P. told appellant that he had to head back in the other direction. Appellant responded that he did not know where Frederick was because he was from the Baltimore area. He used this verbal ploy because he "was trying to . . . get her to talk to me, you know what I mean, a fast pickup is what I was doing." Although appellant knew the area, he pretended ignorance because he "was trying to use a pickup line. . . ." Ms. P. then told appellant to go to a gas station down the road to obtain directions. At that point, appellant "thought [Ms. P.] wanted to be picked up" based on the way she was acting and because, in the past six years, he had picked up four to six prostitutes in the area.

Appellant then asked Ms. P. to show him how to get to Frederick. Ms. P. said that she would be willing to do so except for the fact that she was on her way home. Appellant responded by saying that he would give her a ride home. The

two then agreed that Ms. P. would show him how to get to Frederick as long as he later drove her to her home. Ms. P. then got in his truck. He did not lock the doors.

Appellant followed Ms. P.'s directions to Frederick, and as they traveled, they talked.[2] Ms. P. told appellant about her brother and said that she did not have any money for the bus. She added that she had been out collecting job applications that day.

Appellant continued to follow her directions, and Ms. P. volunteered that she was not married. Appellant told Ms. P. that his name was David. This was his middle name and also the name he had given to the prostitutes in the past. Appellant next asked Ms. P. if she and her boyfriend ever "messed around" or if she was a virgin. Ms. P. said that she was not a virgin. She also said that her boyfriend had abused her.

Eventually, they came to the Route 70 exit sign. Ms. P. told appellant that, if he was going to Frederick, that was his turnoff. Appellant thanked her for the directions and told her he would like to stop so that he could urinate. Ms. P. told him that she did not mind. At that point, they saw a Sheetz Store, and Ms. P. said that he could use the store's bathroom. Appellant responded that he was "very particular" about which public restrooms he used and that he did not want to use the facilities provided by Sheetz.

Appellant continued to drive, and eventually he saw a "Welcome to Frederick County" sign. After they crossed the county line, appellant took the first right onto a road. He then traveled approximately 100 yards down the road until he saw a field with a walkway. Appellant pulled the truck over

---

**2.** On cross-examination, the prosecutor inquired if Ms. P. spoke to appellant as she had while on the witness stand the previous day. Appellant responded: "[W]hen I talked to her when she was in my truck that night she didn't . . . talk really slurish [sic]. I mean I really didn't, didn't get to see her face that well like I did yesterday, but –" The prosecutor then asked if, in speaking with Ms. P., appellant noticed anything wrong with her. Appellant replied: "I noticed that she was a little slow, but not as a mental retard. I mean, just a little slow."

to the side of the walkway, got out, and urinated while Ms. P. remained seated.

Appellant got back into the truck, lit a cigarette, and asked Ms. P. if she would like to make some money. Ms. P. asked how. Appellant responded: "Just fooling around a little bit." When Ms. P. said that she had "never done that before," appellant confided that he was "just trying to have a little bit of sex, do a little something."

Ms. P. then got out of the truck and appeared angry "because it was like she ... wanted to get home or something." Ms. P. started walking away, saying that she was going home. Appellant then persuaded her to come back to the truck because she did not know where she was. They both got back in the truck. Appellant lit another cigarette, they talked again, and Ms. P. again said that she wanted to go home. Appellant then offered Ms. P. $20 if she would "fool around a little bit." After hearing this offer, Ms. P. agreed to engage in sexual intercourse with him as long as he took her back home afterward.

The two walked down a path. When Ms. P. asked what time it was, appellant lied and said that it was earlier than it was, which relaxed Ms. P. because the lie convinced her that she was not already late getting home. As they walked, Ms. P. got caught in a rosebush. Appellant helped free her, and they continued walking along the path until Ms. P. slipped and fell down a slope. Eventually, they came to a creek where they stopped.

Ms. P. got on her knees, appellant pulled his zipper down, and took out his penis, and Ms. P. performed fellatio on him. After 30 to 60 seconds, appellant "pushed her off." He then asked her to place his penis inside of her. According to appellant, "[s]he didn't say no and she didn't say yes. She just more or less did it."

Appellant proceeded to have consensual intercourse with Ms. P. Initially, she was "okay," but when he started to ejaculate, she "freaked out on me" and began "to push and tug" at him. Appellant grabbed Ms. P. and "[t]hat's where

the marks came from ... the marks that she had." Appellant conceded that at one point he had placed his hand over Ms. P.'s mouth "for a couple seconds." He did so because he "was afraid ... she was turning it into something that [it] wasn't." Appellant added that during intercourse he knew "that something was wrong" but did not think "she wanted me to stop until ... at the end where she just ... freaked out." He did not know why Ms. P. "freaked out." According to appellant, when Ms. P. asked him to stop, he did so immediately.

Appellant next helped Ms. P. dress. At that point, Ms. P. said that she needed to get home and was worried about her brother's reaction to her being out late. They walked back to appellant's truck, and appellant gave her $20, which Ms. P. accepted. Nevertheless, Ms. P. was upset.

Appellant told Ms. P. that he was taking her home. As they approached the Sheetz Store, Ms. P. asked him to drop her off there. Appellant pulled into the Sheetz parking lot. Ms. P. said that she would take a cab home and got out of the truck. Appellant then drove away.

Appellant denied ever threatening Ms. P. or saying that he would hurt her if she did not do what he told her to do. He also denied telling her that he had a knife or holding her against her will. Additionally, he testified that all sexual relations he had with Ms. P. were completely consensual.

## III. *REBUTTAL EVIDENCE*

### A. *Testimony of Jacqueline Yu E.*

Jacqueline Yu E. testified that, during the late evening to early morning hours of February 2, 1981, she was returning home and parked her car in the area of Guilford Avenue in Baltimore City. While she stood next to her car, she was approached by a strange man, later identified as appellant. Appellant told Ms. E. that he needed directions to Washington Street and University Avenue because he was going there to visit a friend. Ms. E. told appellant that she did not know where those streets were, but appellant replied that he just

wanted to see his friend and that the address was close by. According to Ms. E., appellant then moved toward her and indicated that he had a knife in his pocket. He did not, however, show Ms. E. the knife.

Appellant next forced Ms. E. to get into her car; he then forced his way into the car and had her roll up all the windows and lock all the doors. He then told her that "all he wanted was a lift to his friend's apartment" and counseled her to "relax [and] that everything was going to be okay."

After driving for several hours, they stopped in a secluded residential area. Appellant had Ms. E. turn off the lights and the engine. Appellant said that he wanted one more thing and that he would then leave. That one thing was "a blow job." Ms. E. told appellant that she did not know what that was so he "forced [her] down ... on to him." After appellant forced Ms. E. to perform oral sex, he then forced her to engage in vaginal intercourse with him. After the rape, appellant allowed Ms. E. to dress and had her drive him to a location where he got out of her car. Ms. E. then drove away.[3]

### B. *Testimony of Corporal David Deweiss*

Corporal David Deweiss of the Frederick County Sheriff's Office testified that, on November 26, 2003, he interviewed appellant at the Frederick County Law Enforcement Center. Also present during the interview was Maryland State Trooper First Class Rick Bachtel. After the corporal advised appellant of his Miranda rights, appellant said that he understood those rights and agreed to speak with the officers without an attorney being present. In the course of the ensuing interview, appellant admitted that he typically brings prostitutes to a secluded area near where he had picked them up. At first, appellant could not explain why he drove to another county with Ms. P., but later he said that it was "[b]ecause she was talking," i.e., she talked continuously about looking for jobs and putting in applications. Her talkativeness

---

**3.** The record is silent as to how or when appellant was identified as the person who raped Ms. E.

caused appellant to become agitated because "he had picked her up for sex."

Corporal Deweiss also testified that, when questioned by Trooper Bachtel, appellant denied placing his hand over Ms. P.'s mouth. Later in the interview, in reply to the corporal's question, appellant once again "adamantly denied" covering Ms. P.'s mouth with his hands. When the corporal inquired if appellant might have inadvertently placed a hand over her mouth, appellant again stated that he had not done so. After Corporal Deweiss informed appellant that Ms. P. had said that he had placed his hand over her mouth, appellant admitted that he had done so "for a couple of seconds" during intercourse because she continued to talk about job hunting and putting in applications.

According to Corporal Deweiss, appellant also recalled during questioning by the corporal that he and Ms. P. had argued over when she was to be paid. Ms. P. wanted to be paid before the sexual acts, but appellant wanted to pay her afterward.

## IV. *DISCUSSION*

### A.

Prior to calling Ms. E. as a rebuttal witness, the prosecutor proffered that Ms. E. would

testify that in 1981 she was approached by the defendant in Baltimore ... and asked for directions. She was standing next to her vehicle, that he forced her, that he told her that he had a knife in his pocket and threatened to harm her. He told her everything would be all right if she did what he said. And he forced her in ... her car that she's standing next to and abducted her. He forced her to perform oral sex, and then he forced sexual intercourse on her. And after he was finished he ... essentially let her go.

The prosecutor argued that Maryland Rule 5–404(b) permit-

ted evidence of other crimes under the mimic exception.[4]   The prosecutor also maintained that the other crimes evidence was admissible to rebut the defense of consent, as permitted by *Stevenson v. State,* 94 Md.App. 715, 619 A.2d 155 (1993).

Defense counsel responded that the details of the offense were not so unusual as to distinguish it from a typical sex offense case.   In this regard, counsel argues that there were "not enough distinctive common details" to allow for admission of the prior offense.   The trial court found that the other crimes evidence was admissible both to rebut the defense of consent and under the common scheme or plan exception.

In this appeal, appellant contends that the trial court erred in admitting Ms. E.'s testimony because (purportedly) it was offered simply to show appellant's propensity to commit crime or his character as a criminal.   Appellant asserts that, in order for the other crimes evidence to be admissible to disprove consent, the prior criminal activity must qualify as a "signature" crime.   Appellant refers us to out-of-state cases, primarily those cited in *Stevenson, supra,* in support of his position that, in order for "other crimes" to be admissible to prove lack of consent, the prior rape must qualify as a signature crime, the relevancy of which has not been diminished by the passage of time.   Appellant further asserts that the prior rape and sexual assault did not have the attributes of a signature, which would make them relevant to the allegations in the present case.   In addition, appellant maintains that the passage of more than twenty years between the two events makes the first crime even less relevant to the consent issue.

To further support his argument, appellant refers us to Maryland Rule 5–609(b), which does not permit impeachment by use of a prior conviction more than fifteen-years old.

Appellant also argues that the prejudicial effect of the evidence presented by Ms. E. was demonstrated by the prose-

---

4.   There had also been an off-the-record discussion in chambers regarding the other crimes evidence to which Ms. E. would testify.

cutor's heavy reliance on that testimony during closing argument.[5]

Generally, "evidence of a defendant's prior criminal acts may not be introduced to prove guilt of the offense for which the defendant is on trial." *Ayers v. State,* 335 Md. 602, 630, 645 A.2d 22 (1994) (citations omitted). Prior criminal acts are excluded to avoid confusing the jurors, prejudicing their minds against the defendant, and predisposing them to a belief that the defendant is guilty. *Terry v. State,* 332 Md. 329, 334, 631 A.2d 424 (1993). The rule excluding "other crimes" reflects a "fear that jurors will conclude from evidence of other bad acts that the defendant is a 'bad person' and should therefore be convicted, or deserves punishment for other bad conduct and so may be convicted even though the evidence is lacking . . . ." *Harris v. State,* 324 Md. 490, 496, 597 A.2d 956 (1991).

"Evidence of other crimes may be admitted, however, if it is substantially relevant to some contested issue in the case and if not offered to prove the defendant's guilt based on a propensity to commit crime or his character as a criminal." *State v. Faulkner,* 314 Md. 630, 634, 552 A.2d 896 (1989) (citations omitted). Accordingly, Maryland Rule 5–404(b) provides:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for

---

**5.** The prosecutor said in his closing argument:

The defendant want[s] you to believe that in asking for directions he was simply using his old pick up line for a prostitute. But that was no ice-breaker. He intended to abduct. His scheme was to threaten and commit sexual assault, and we don't have to look any further than what Jacqueline Yu [E.] told you to understand that. You can consider her testimony when assessing the defendant's intent, his common scheme, his absence of mistake. He wasn't looking for a prostitute. Without question the defendant told Ms. [E.] or the defendant approached Ms. [E.], asked her for directions, told her he had a knife in his pocket, but never showed it, abducted her for hours, forced her head and made her perform oral sex, then raped her, and then he let her go.

other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, or absence of mistake or accident.

These "recognized 'exceptions' to the exclusionary rule are not exclusive." *Harris*, 324 Md. at 501, 597 A.2d 956.

"Before other crimes evidence is admitted, a three-part determination must be made by the trial court." *Sifrit v. State*, 383 Md. 116, 133, 857 A.2d 88 (2004). *See also Skrivanek v. State*, 356 Md. 270, 291–92, 739 A.2d 12 (1999), *Streater v. State*, 352 Md. 800, 806, 724 A.2d 111 (1999); and *Wynn v. State*, 351 Md. 307, 324–25, 718 A.2d 588 (1998). First, the trial court must determine whether the evidence fits within one of the exceptions. *Faulkner*, 314 Md. at 634–35, 552 A.2d 896. This is a legal determination that does not involve any discretion. *Faulkner*, 314 Md. at 634, 552 A.2d 896; *see also Oesby v. State*, 142 Md.App. 144, 159, 788 A.2d 662 (2002). Second, if the prior offense fits within one of the exceptions, then the trial court must determine "whether the accused's involvement in the other crimes is established by clear and convincing evidence." [6] *Faulkner*, 314 Md. at 634, 552 A.2d 896 (citations omitted). Third, the trial court must carefully balance the necessity for and probative value of the other crimes evidence against any undue prejudice likely to result from its admission. *Id.* at 635, 552 A.2d 896. This is a discretionary determination on the part of the trial court. *Id.*; *see also Oesby*, 142 Md.App. at 167–68, 788 A.2d 662 ("This final balancing between probative value and unfair prejudice is something that is entrusted to the wide discretion of the trial judge.... Reversal should be reserved for those rare and bizarre exercises of discretion that are, in the judgment of the appellate court, not only wrong but flagrantly and outrageously so.").

In *Stevenson v. State*, 94 Md.App. 715, 619 A.2d 155 (1993), the defendant was charged with the rape of his estranged

---

6. In this appeal, the appellant did not contend that the State failed to prove the prior offense by clear and convincing evidence.

wife. The State's evidence demonstrated that Mr. Stevenson broke into his wife's home, demanded that she have sex with him, and raped her when she refused. The defense was that of consent.

At trial, the defendant's wife was allowed to testify about an incident that occurred ten months prior to the alleged rape. In the prior incident, the defendant broke into his wife's home, asked her to make love to him, and when she refused, attacked her with a butcher knife and cut off her shoulder-length hair. Prior to trial, the defendant pled guilty to the battery as a result of the first incident.

On appeal, this Court concluded that admission of the wife's testimony concerning the previous battery was not error because it was relevant to counter the husband's consent defense. *Stevenson,* 94 Md.App. at 724, 619 A.2d 155. The prior battery helped explain why, at the time of the rape, the wife eventually stopped fighting the defendant in that it showed her fear of him and of the possibility that more violence might be directed at her. *Id.* at 725–26, 619 A.2d 155. In reaching this conclusion, we relied on numerous cases from other states, which had "recognized that other crimes evidence is admissible to rebut a consent defense in a rape case." *Id.* at 726, 619 A.2d 155 (citations omitted).[7] We also noted:

> The probative value of such evidence is so great that it has been permitted even when the prior bad activity took place *years* before the present charge. Indeed, many courts have permitted evidence of other previous bad acts by the defendant perpetrated on victims *other* than the prosecutrix to be admitted to counter a defense of consent.
>
> * * *
>
> ... [W]e have not found a single case in which a court has held that evidence of a related crime, committed less than a year earlier than the rape at issue, by the same defendant,

---

7. It is almost entirely from these cases that the parties argue their respective positions.

against the same victim, was inadmissible to counter a consent defense.

*Stevenson,* 94 Md.App. at 727, 619 A.2d 155 (citations omitted and emphasis in original).

We said in *Stevenson:*

In the case at hand, as in the cases cited above, the evidence of the March battery was "not offered to prove the defendant's guilt based on a propensity to commit crime or his character as a criminal," but rather was relevant to a "contested issue in the case," *i.e.,* whether [the defendant's wife] consented to intercourse. *Faulkner,* 314 Md. at 634, 552 A.2d 896. Thus, the battery possessed "special relevance transcending mere criminal character." *Harris,* 324 Md. at 504, 597 A.2d 956. Not only was the "necessity for the evidence ... obvious[,]" but also proof of the March battery was "clear, convincing and uncomplicated"; appellant had pled guilty to the offense. *Id.*

Finally, we believe that the "probative value" of the evidence as to the March battery substantially outweighs the "potential for prejudice." *Id.* The evidence as to the March battery was obviously potentially inflammatory. [The defendant's wife's] testimony as to it, however, was a very limited portion of her extensive testimony; it is contained in only 6 transcript pages-her testimony consumed more than 120 pages. Moreover, her account in the transcript, considering the subject matter itself, appeared relatively passionless. Furthermore, here, as in *Howard v. State,* 324 Md. 505, 516, 597 A.2d 964 (1991), the evidence of the prior crime came from the same witness who presented the principal evidence against the defendant. Thus, as in Howard, "[i]f the jury chose to reject" that witness's testimony "as to how this incident occurred, it is likely they would reject as well her testimony concerning the alleged prior" crime. *Id.* Accordingly, we conclude as the Court of Appeals did in Howard, that "the trial judge did not err in finding that the relevance of this testimony," crucial as it

was, "was not outweighed by its potential for unfair prejudice." *Id.*

*Stevenson,* 94 Md.App. at 728–29, 619 A.2d 155.

Many cases cited in *Stevenson* allowed evidence of other sex crimes that were quite similar to the offenses for which the defendant was on trial. *See, e.g., Williams v. State,* 95 Nev. 830, 603 P.2d 694, 696–97 (1979) (the defendant was charged with raping a woman in 1978 after the victim met with the defendant for a job interview and at the interview he demonstrated his expertise in the art of karate; other crimes evidence admitted through testimony of two other women, who each testified that, in 1976, they had met defendant at a job interview and that he subsequently coerced them into submitting to intercourse after demonstrating his karate abilities; Court noted the "remarkable similarity of the modus operandi in the testimony regarding the other crimes, and their relative proximity in time to the charged offense"); *People v. Oliphant,* 399 Mich. 472, 250 N.W.2d 443, 450–52 (1976) (noting that there were "many similarities" in the other crimes evidence presented by three witnesses when compared to the victim's testimony, i.e., that the defendant, who initially appeared friendly, agreed to drive the women to their destinations, but then became aggressive and assaulted the women; such other crimes evidence tended to show a plan or scheme to orchestrate the events surrounding the rape so that the victim would be unable to show non-consent and the defendant could thereby escape punishment).

Our review of the cases cited by the parties, however, reveals only two that discussed the need for the offenses to be so similar as to constitute a "signature." [8] *See Youngblood v.*

---

**8.** In *McKnight v. State,* 280 Md. 604, 613, 375 A.2d 551 (1977), the Court of Appeals, while discussing the *modus operandi* exception, commented that *modus operandi* may be established by showing that the other crimes are "so nearly identical in method as to earmark them as the handiwork of the accused.... The device used must be *so unusual and distinctive* as to be like a signature." (quoting C. McCormick, *Evidence* § 190, at 449 (2d ed. 1972)) (emphasis added in *McKnight*).

*Sullivan,* 52 Or.App. 173, 628 P.2d 400, 402 (1981) (defendant committed acts in a way "so unique as to constitute a signature" and that the two offenses were "unique and virtually identical" such that the "[d]efendant's story that the victim in this case consented tends to be rebutted by evidence that defendant has had a nonconsenting encounter with another person in this strikingly singular way"); *see also State v. Plaster,* 424 N.W.2d 226, 231 (Iowa 1988) (commenting that defendant's actions in each instance were " 'so unique as to constitute a signature' ") (citation omitted).[9]

Most cases, however, required that the incidents be similar, albeit not a signature. For example, in *State v. DeBaere,* 356 N.W.2d 301 (Minn.1984), the victim testified that the defendant entered her residence and, after a struggle, raped her. The victim did not know how the defendant, who had on other occasions entered her residence uninvited, gained access to her home, but she explained that her children sometimes forgot to lock the door. The defendant claimed that the victim invited him into her house and consented to the act of intercourse.

The following other crimes evidence was admitted at the *DeBaere* trial:

(i) Testimony by two women that in the fall of 1979 defendant, whom they both knew but had never dated, came to their apartment early in the morning after a dance they had all attended and, after being admitted, attempted but failed to force each of them to have sexual intercourse with him before they joined forces and pushed him out of the apartment. They did not report the matter to the police.

(ii) Testimony by a woman that on April 27, 1980, she met defendant at a dance and afterward he offered to drive her to a restaurant but instead drove her to a field where he raped her. Defendant was convicted of criminal sexual conduct in the fourth degree (apparently as a result of a guilty plea) in connection with that incident.

9. This case was not cited in *Stevenson.*

(iii) Testimony by a woman, who knew defendant but had not dated him, that early on the morning after Halloween, 1981, defendant, after gaining entrance to her apartment by saying that he needed to talk, attempted to force her to have sexual intercourse with him before she broke free, picked up a chair and ordered him to leave. She did not report the incident.

(iv) Testimony by a female relative of defendant that early on January 1, 1982, defendant entered her room at her father's house without permission, jumped into bed with her, and tried to force her to have sexual intercourse with him before he was scared off when a light flickered.

*DeBaere,* 356 N.W.2d at 304–05.

The Minnesota Supreme Court upheld the admission of this evidence:

In this case the defendant allegedly entered the house of a female acquaintance without consent, forced himself on her, and then, when complaint was made, claimed consent. The other-crime evidence showed a pattern of similar aggressive sexual behavior by defendant against other women in the community. Given our prior cases—*e.g., State v. Morrison,* 310 N.W.2d 135 (Minn.1981)—we believe that the trial court did not abuse its discretion in admitting the evidence, which was highly relevant to the issue of consent.

*Id.* at 305.

As can be seen, the prior bad acts admitted in *DeBaere* were similar but by no means identical or signature crimes. *See also Fisher v. State,* 57 Ala.App. 310, 328 So.2d 311, 318 (Crim.App.1976) (evidence of defendant's assault on a woman five days prior to the rape in question was relevant to motive and intent and to rebut defense of consent); *State v. Hill,* 104 Ariz. 238, 450 P.2d 696, 697 (1969) (victim testified she awoke to find defendant straddling her, holding scissors to her neck, told her to be quiet or be killed, then engaged in various sexual acts with her, but defendant claimed he picked up woman and agreed to pay her for sexual intercourse and that the woman claimed rape after he refused to pay; prior offense

properly admitted where woman testified that defendant broke into her home, threatened her with a sharp object then sexually assaulted her; court noted that the facts of the prior crime bore a "remarkable similarity" to the facts of offense at issue); *People v. Gray*, 259 Cal.App.2d 846, 852–53, 66 Cal. Rptr. 654 (1968) (though defendant came to be in company of the female victims through various strategies, other crimes evidence of his attacks on them was properly admitted because it "showed a pattern of sudden violent post-midnight attacks upon female acquaintances"; the "collateral events tend to show the same peculiar and characteristic behavior pattern which is manifested in the crime charged, and thus make it more probable that [the victim] was telling the truth about what had happened"; the defendant's behavior pattern also tended "to rebut the defense theory that the attack described by [the victim] was too senseless to be credible"); *Williams v. State*, 110 So.2d 654, 661–62 (Fla.1959) (where defendant alleged that he got into the backseat of woman's car because he thought it was his brother's car and he wanted to take a nap, trial court properly admitted evidence that, on a previous occasion, in the same parking lot, defendant was found in the backseat of another woman's car and claimed that he sat in the backseat because he thought it was his brother's car and he wanted to take a nap); *O'Neal v. State*, 170 Ga.App. 637, 318 S.E.2d 66, 67 (1984) (noting that "there must be sufficient similarity between the independent crime and the offense charged that proof of the former tends to prove the latter") (citation omitted); *People v. Weis*, 120 Ill.App.3d 597, 76 Ill.Dec. 18, 458 N.E.2d 157, 159–60 (1983) (in trial for sexual assault of his former girlfriend, defendant's prior assaultive behavior against girlfriend admitted to demonstrate the unlikelihood of consent in light of the evidence showing how their relationship had deteriorated); *People v. Lighthart*, 62 Ill. App.3d 720, 19 Ill.Dec. 739, 379 N.E.2d 403, 405 (1978) (where defendant claimed sex was consensual, prior conviction for attempted rape "was probative of defendant's mental state and was properly admitted") (citation omitted); *State v. Smith*, 216 Kan. 265, 530 P.2d 1215, 1219 (1975) (where defendant abduct-

ed neighbor, brought her to his apartment, raped her, then shot victim's husband when he came to her aid, prior offenses in which defendant was convicted of an assault with a gun upon a man who was shot several times and a felonious assault with the intent to rape a female companion were properly admitted where defenses asserted were self-defense as to the murder charge and consent as to the rape charge); *State v. Gainey*, 32 N.C.App. 682, 233 S.E.2d 671, 673 (1977) (noting that "similar sex offenses" were admissible to show knowledge, intent, motive, plan or design, identity, etc.); *Commonwealth v. Rough*, 275 Pa.Super. 50, 418 A.2d 605, 612 (1980) (in rape trial, evidence that defendant had previously attempted to have sex with victim and had previously touched her breasts, properly admitted to show defendant's intent). *See also Hunt v. State*, 233 Ga. 329, 211 S.E.2d 288, 289–90 (1974) (at trial, victim testified that she met defendant in a bar, then, using defendant's car, they went out to eat, at which point defendant told her he wanted to show her where he spent the happiest years of his life, despite victim's protests, he took her there, drove around, and eventually raped victim; other crimes evidence admitted demonstrated that defendant and another woman had gone out together, he told her he wanted to show her where he was raised, defendant drove there and raped the woman; appellate court concluded that there were "numerous similarities" between the offenses and that the other crimes evidence "would show the intent, motive, plan, scheme, and bent of mind of the appellant, and was relevant on the issue of whether or not the prosecutrix consented to the sexual acts"); *State v. Nelson–Waggoner*, 6 P.3d 1120, 1126 (Utah 2000) (commenting that "bad acts evidence has been admitted for the noncharacter purpose of proving the element of lack of consent in certain rape trials" and that it was "especially true when a defendant allegedly obviates the victim's consent in a *strikingly similar manner* in several alleged rapes") (citations omitted and emphasis added).

■ The just-cited cases undermine appellant's assertion that to be admissible the prior offenses must be a "signature crime," nor does appellant persuade us that such a require-

ment should be imposed in a case like this where the prior actions by the defendant against Ms. E. were quite similar, albeit not precisely identical, to those committed upon Ms. P. In both instances, appellant approached women seeking directions. In each case, the victims were transported by automobile, and the car doors were locked during the transport by appellant. Further, according to the victims, appellant told both women that he had a knife. He also told both women that everything was going to be okay if they cooperated. Appellant traveled with both women for a long time, eventually coming to secluded areas where he first forced them to perform oral sex and then engaged in non-consensual vaginal intercourse with them. Following these acts, he allowed the women to dress and go free.

Appellant refers us to *State v. Cox*, 787 P.2d 4 (Utah Ct.App.1990), in support of his argument that a prior offense of the sort admitted in this case was inadmissible. In *Cox*, the Utah Court of Appeals held that the similarities between two incidents were not sufficient. Those similarities were that the

(1) defendant knew each victim; (2) defendant had nonconsensual intercourse, at each victims' home, while the victims' boyfriends or husbands were not home; (3) defendant was uninvited and began the assaults soon after entering the home; (4) defendant laid on top of the victims; (5) defendant did not completely remove his clothing or the victims' clothing, and in each instance, attempted to kiss the victim on the face and neck; and (6) defendant left the premises after completing the assault.

787 P.2d at 6. The *Cox* Court concluded that the defendant's actions did not constitute common design or modus operandi. *Id.* Rather, the similarities were common to many assault or rape cases and were not peculiarly distinctive of the defendant's conduct. *Id.* By contrast, appellant's ploy of asking directions, traveling with the victims on long trips, threatening them with a knife, and after forced sex, letting the women go free cannot be characterized as common to many rape or assault cases.

■ Also, we reject appellant's proposed bright-line rule that a more than twenty-year-old offense is *per se* inadmissible for the purpose of rebutting the defense of consent to a sexual act. Rather, the remoteness of the offense is an item for the trial court's consideration when engaged in the third step of the required analysis, i.e., the probative value of the evidence against the danger of unfair prejudice. In this regard, we note that other courts have permitted some very old offenses to be admitted at trial as proof of prior bad acts. *See, e.g., United States v. Ismail,* 756 F.2d 1253, 1260 (6th Cir.1985) ("There is no absolute maximum number of years that may separate a prior act and the offense charged."); *United States v. Strong,* 415 F.3d 902, 905–06 (8th Cir.2005) (in upholding admission of a 16–year–old prior offense, the court commented that there was no absolute rule regarding the number of years that can separate offenses), *cert. denied,* —— U.S. ——, 126 S.Ct. 1121, 163 L.Ed.2d 927 (2006); *United States v. Vo,* 413 F.3d 1010, 1018–19 (9th Cir.2005) (upholding admission of 13–year–old prior offense), *cert. denied,* —— U.S. ——, 126 S.Ct. 785, 163 L.Ed.2d 608 (2005); *United States v. Lampley,* 68 F.3d 1296, 1300 (11th Cir.1995) (upholding district court's admission of 15–year–old prior bad act); *People v. Gray,* 259 Cal.App.2d 846, 851–53, 66 Cal.Rptr. 654 (1968) (evidence of prior incident that occurred approximately ten years prior to crime for which defendant was on trial was properly admitted); *State v. Blom,* 682 N.W.2d 578, 611–13 (Minn.2004) (in light of similarity of incidents and issue of identity, trial court properly admitted a prior incident that occurred sixteen years prior to trial); *State v. Wermerskirchen,* 497 N.W.2d 235, 243 n. 3 (Minn.1993) ("Often the passage of time, while superficially significant, turns out to be without real significance .... as when the older offense is part of a 'pattern' of similar misconduct occurring over a number of years.") (citations omitted); *State v. Rainer,* 411 N.W.2d 490, 496–98 (Minn.1987) (upholding admission of evidence of sixteen- to nineteen-year-old incidents, which showed a repeating pattern of very similar conduct); *State v. Matson,* 227 Mont. 36, 736 P.2d 971, 977 (1987) (unless the remoteness in time is so great that the

evidence has no value, the remoteness of a prior offense is committed to the discretion of the trial court and is a matter that goes to the credibility of the evidence rather than its admissibility); *Hart v. State,* 57 P.3d 348, 358 (Wyo.2002) (trial court did not abuse its discretion in finding admissible the testimony as to similar acts of misconduct by the defendant that were alleged to have occurred more than twenty-five years before the charged offense). *But see State v. Cox, supra,* 787 P.2d at 6 (where the two prior acts occurred nearly two years before defendant was charged with a third, unrelated sexual assault and there was no apparent connection between defendant's earlier conduct and his intent in relation to the current rape charge, evidence of other offense should not have been admitted); *see also Purviance v. State,* 185 Md. 189, 198, 44 A.2d 474 (1945) ("The question of excluding evidence because of remoteness rests largely in the sound discretion of the trial judge.") (citation omitted); *Hoes v. State,* 35 Md.App. 61, 70, 368 A.2d 1080 (1977) (where prior shooting took place approximately five years before shooting for which defendant was on trial, we held that " 'the nature of the prior crime and the crime charged and the logical interrelationship of such crimes are the controlling factors in determining whether a particular lapse of time is sufficiently substantial to make the prior crime too remote' ") (quoting I Wharton's Criminal Evidence § 260, p. 622).

In the subject case, the similarities between the two offenses weighed in favor of admitting the other crimes evidence. We perceive no abuse by the trial court in admitting the rebuttal testimony of Ms. P.

■■■ Appellant also refers us to Maryland Rule 5–609, which addresses the admission of prior convictions for purposes of impeachment. Under Rule 5–609(b), a prior *conviction* is not admissible for purposes of impeachment of the defendant's credibility if more than fifteen years have elapsed from the date of the conviction. Maryland Rule 5–404 addresses the admission of other crimes evidence and does not

contain a time limit for admission of that evidence. We decline to engraft such a requirement onto Rule 5–404.

## B.

■■■ On Monday, July 12, 2004, shortly before trial began, appellant, through his defense counsel, requested a postponement of his case on three grounds. First, appellant believed that he and defense counsel were not prepared for trial because they had met only twice and appellant had not been able to give his counsel a detailed account of the events at issue. Second, appellant indicated that he would like to retain additional counsel to assist in his defense. Third, appellant had not been aware previously that trial was to start that day.

The following exchange then occurred between the court and defense counsel:

THE COURT: [Defense Counsel], are you prepared to go to trial today?

[DEFENSE COUNSEL]: Uh, pretty much. Uh, I, I, I would say that, uh, if there were more time I would be more prepared. Uh, there have been some things that have come to light, uh, for instance, uh, uh, I just, just learned pretty much over the weekend that the State may be bringing another witness down to testify about a prior offense in a signature or pattern type crime. And, uh, that was just disclosed yesterday, because I don't think the State knew it any, any earlier than that. Uh, and if that evidence came in, uh, it would be very devastating in this case, and that's something that we were not aware of until just, in fact, it was yesterday, Sunday.

Uh . . .

THE COURT: [O]ther than that are you prepared to go to trial?

[DEFENSE COUNSEL]: Yes, sir.

Appellant then reiterated: (1) that he had not had enough time to speak with his attorney and (2) that he did not know he was to proceed to trial that day. The trial court, in

response, pointed out that, on March 8, appellant appeared before the court and was twice informed of the trial date. Further, a worksheet, which also listed the trial date, had been provided to counsel for appellant.

Defense counsel then reminded the court that the State was seeking life imprisonment without the possibility of parole and that there had not been a prior request for a postponement by either the defense or the State. Counsel added that he was "certainly amenable to having other Counsel involved in this case because of the ... serious nature of the case."

The prosecutor informed the court that she was prepared to go forward with trial and was opposed to a postponement.

The trial court noted that appellant met with counsel on Friday (July 9, 2004, which was three days before trial) and that defense counsel indicated that in his (defense counsel's) view his discussions with appellant were sufficient. The court also said that the evidence to which counsel referred (testimony of Ms. E.) had not yet been ruled upon and, even if admitted, would not come in until rebuttal. Finally, even though appellant believed trial was to start the following week, appellant had made no effort to secure additional counsel. As a result, the court found: "There are no valid reasons for continuance."

A discussion regarding appellant's rejection of two proposed plea agreements next ensued. When defense counsel advised the court that appellant would not accept either agreement and would rather go to trial, the court asked appellant if that was correct and appellant responded: "I don't know. I need more time." Appellant then inquired: "Is there anyway possible I can get other legal representation?" The court immediately asked appellant why he sought new counsel. Appellant replied that his lawyer did not know "every single detail of the incident that night." The court thereafter once again noted that appellant had met with his counsel on the past Friday and that defense counsel had advised the court that the visit ended because there was nothing more to discuss.

Appellant next asked what would happen if he dismissed his lawyer in order to obtain new counsel. The court explained that, if he did not have a valid reason to discharge counsel, and the court had not yet heard such a reason, appellant would go to trial that day without an attorney. Appellant again said that he was not prepared to go to trial, and the court once again inquired as to appellant's reasons for seeking new counsel. Appellant replied that his attorney did not "know everything that happened that night from beginning to end. . . ." In addition, appellant said that his counsel had read the victim's statement to him, and he had not had time to go through the statement and inform counsel what were and were not the "lies in the statement."

Defense counsel indicated that he was prepared to try the case and that, on Friday, appellant had not informed him of the concerns he had just related to the court. Counsel added, however, that at their last meeting appellant had asked him whether he was prepared, and counsel responded that he believed that he was prepared. The court then once again denied appellant's motion for a continuance.

Appellant contends that the trial court abused the discretion granted to the trial court under Maryland Rule 4–215(e) when it refused to grant him a postponement in order to obtain new counsel. He alleges that his reasons for requesting the post-ponement and his justified dissatisfaction with counsel were more than ample proof that a postponement was warranted. We disagree.

First, and most important, appellant's dissatisfaction with his counsel was not shown to be justified. His reasons for a postponement were likewise not well grounded. Appellant was explicitly advised of the trial date long before trial. Appellant had no valid reason to believe trial was set for a week later than the date actually scheduled. Moreover, even if it was true that appellant thought trial was one week later, he gave no indication as to how he would utilize the extra time except to say that he wanted to retain new counsel. In light of the fact that new counsel had not been either retained or

even contacted as of July 12, 2004, the trial judge had good reason to doubt that appellant had been diligent in attempting to obtain replacement counsel. Under these circumstances, the trial court did not abuse its discretion in declining to grant appellant's request for a continuance so that he could obtain new counsel.[10]

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

**10.** We note that appellant makes no allegation that the trial court should have permitted him to discharge counsel and proceed *pro se*.